The LANE PROCESSING TRUST; John E. Peterson, Jr., Walter W. Minger, Edward H. Covell, Trustees, Appellees,

v.

UNITED STATES of America, Appellant.

No. 93–2422.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 12, 1994.

Decided May 31, 1994.

Rehearing Denied July 7, 1994.

William S. Estabrook, Dept. of Justice, Washington, DC, argued, for appellant.

James P. Parker, Washington, DC, argued, for appellee.

Before BOWMAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and WOLLMAN, Circuit Judge.

BOWMAN, Circuit Judge.

The United States appeals the judgment of the District Court awarding the Lane Processing Trust an employment tax refund. We reverse.

## I.

In November 1982, the Lane Companies (Lane Processing, Inc., Dexter Farms, Inc., Dexter Processing, Inc., and Lane Poultry of Carolina, Inc., and their subsidiaries) and their owners, Dorothy and Clift Lane, filed for bankruptcy. A reorganization plan later was approved by the bankruptcy court, under which the Lane Companies operated until the summer of 1985, when the Lane Companies' defaults raised the prospect of liquidation.

To avoid liquidation, in July 1985 the Lanes relinquished all control of the Lane Companies to the newly formed Lane Processing Trust. The Lanes also turned over to the Trust the Lane Companies' stock, which at the time had a negative book value of $8,197,237. The Companies' employees were designated beneficiaries of the Trust. John E. Peterson, Jr., Edward H. Covell, and Walter W. Minger, who had been members of a special panel established by the bankruptcy reorganization plan, became the trust-

ees of the Trust. They also served as the board of directors and senior executives and officers of the Lane Companies. The Lanes received a contract under which they would offer consulting services to the Lane Companies.

The trustees quickly informed the Lane Companies' poultry growers and creditors, and some of the Companies' employees, of the change in ownership and management and of their plans for keeping the Companies operating. In addition, the changes, including the employees' beneficial ownership of the Lane Companies, were reported widely in the media and trade publications. The employees were told by the trustees that their assistance would be needed to keep the Companies operational and that they would benefit financially if the Lane Companies became profitable. At least some supervisors passed this information along to various production workers.

Despite depressed wages and benefits, particularly for the employees of the Arkansas Division, many employees remained with the Lane Companies during this period. In fact, the turnover rate actually decreased in many divisions. Some employees believed that, as the financial prospects of the Lane Companies improved, so would theirs. Employees who joined the Companies after the Trust was established were not notified formally of the ownership arrangement, but the information was widely known and was readily available, and they may have learned of it.

The trustees and new management's guidance and the employees' efforts helped to reverse the Lane Companies' fortunes in a remarkably short time. The stock of the Lane Companies was sold in May 1986 to Tyson Foods for $35,000,000. After Tyson Foods had signed a letter of intent to purchase the Lane Companies, but prior to the sale, the Lane Companies distributed a letter to the employees, informing them of recent events and telling them that their efforts had played an integral role in the Companies' turnaround and that the cash from the sale belonged to them.

After the sale of the Lane Companies, the Lanes sued for the sale proceeds. The Lanes' attempts to secure control of the proceeds failed, however, and in December 1990 the sale proceeds were distributed to the former Lane Companies employees pursuant to a court-approved distribution plan. Under this plan, one half of the sale proceeds was distributed to the trustees and other members of top management, the other half to workers and lower-level members of management who were employed by the Lane Companies (and had been for three and one-half months) when the sale was completed.

The amount of each employee's distribution was determined by where the employee worked and the employee's length of employment and job classification. Each of the employees who had worked for the Companies for less than one year in the lowest job classification received either $995 or $1094.50, depending on the plant location (employees of the lower-paid Arkansas Division received ten percent more than did those of the Alabama Division), while the employees who had been in the lowest classification for between one and five years received either $1990 or $2189, again depending on location. At the other end of the range, eighty-six employees each received at least $21,890. The trustees distributed to themselves thirty-two percent of the total amount distributed.

The Trust withheld and paid employment taxes as if the distributions were wages. In 1991, the Trust filed a claim for a refund, which the Internal Revenue Service denied. The Trust then brought this action for a refund in the District Court, seeking a refund of employer and employee Federal Insurance Contributions Act (FICA) taxes and Federal Unemployment Tax Act (FUTA) taxes (together known as employment taxes) in the amount of $1,567,378.67, plus interest. The parties agree the distributions were income, and thus subject to income tax, but they dispute whether the distributions were "wages" within the meaning of, and thus subject to tax under, FICA and FUTA. On cross-motions for summary judgment, the District Court concluded that the distributions were not wages and ordered the refund. The government appeals, and we reverse.

## II.

We review de novo a district court's grant of summary judgment. *Pentel v. City of Mendota Heights,* 13 F.3d 1261, 1263 (8th Cir.1994). Where there are no genuine issues of material fact, summary judgment for the party that is entitled as a matter of law to a judgment in its favor is appropriate. *Id.*

FICA requires employees to pay social security tax on their wages. 26 U.S.C. § 3101 (1988). FICA also requires employers to pay social security tax with respect to these same wages. *Id.* § 3111 (1988). Under FUTA, employers also are required to pay an unemployment tax on employee wages. *Id.* § 3301 (Supp. IV 1992).

The question we must answer in this case is whether the distributions by the Lane Processing Trust to the former Lane Companies employees constituted "wages" within the meaning of FICA and FUTA. These Acts broadly define "wages" as "all remuneration for employment." *Id.* § 3121(a) (1988) (FICA); *id.* § 3306(b) (1988) (FUTA). FICA and FUTA provide a list of exceptions to this broad definition of "wages," but the parties agree that none of the listed exceptions is relevant here. "Employment," which these Acts also broadly define, means "any service, of whatever nature, performed ... by an employee for the person employing him." *Id.* § 3121(b) (1988) (FICA); *id.* § 3306(c) (1988) (FUTA). Thus, all "compensation for employment" is subject to FICA and FUTA taxes, regardless of what it is called. 26 C.F.R. § 31.3121(a)–1(c) (1993) (FICA); *id.* § 31.3306(b)–1(c) (1993) (FUTA). Courts are to construe these provisions broadly to effect FICA's and FUTA's remedial purposes. *See United States v. Silk,* 331 U.S. 704, 711–12, 67 S.Ct. 1463, 1466–67, 91 L.Ed. 1757 (1947) (discussing congressional intentions regarding the term "employment" under the Social Security Act); *STA of Baltimore–ILA Container Royalty Fund v. United States,* 621 F.Supp. 1567, 1573 (D.Md. 1985) (same regarding "wages" under FICA), *aff'd,* 804 F.2d 296 (4th Cir.1986).

Were the distributions to the Lane Companies employees "remuneration for employment"? We believe they were. The payments made to each employee were based on factors traditionally used to determine employee compensation, specifically, the value of the services performed by the employee, the length of the employee's employment, and the employee's prior wages.

The Trust's contention that the distributions were the fruits of ownership is not persuasive. Employees who had been with the Lane Companies when the stock was put into the Trust for the benefit of the employees were ineligible for distributions if they no longer were with the Companies when the stock was sold to Tyson Foods, regardless of the reason for departure. The lack of ownership interests on the part of the employees is underscored by the fact that even employees of plants that were closed or sold before the sale lost their eligibility for distributions. In contrast, employees who joined the Companies a mere three and one-half months before the sale received distributions by virtue of their employment when the Lane Companies were sold. Although we do not disagree with the general proposition advanced by the Trust—that an individual can be both an employee of a company (receiving wages) and an owner of a company (receiving dividends)—the facts of this case clearly demonstrate that such was not the case here.

Indeed, the status of the disputed payments as "wages" is even more readily apparent in this case than in the cases the government has cited to us. For example, in *STA of Baltimore,* 621 F.Supp. at 1572, the court concluded that payments constituted "wages" because, in part, the employees' receipt of disbursements from the trust was conditioned on prior service to the employer. The court in *NYSA–ILA Container Royalty Fund v. Commissioner,* 847 F.2d 50, 53 (2d Cir.1988), which construed trust distributions that were similar to those at issue in *STA of Baltimore,* came to the same conclusion, even though the eligibility requirements were looser than those of the trust in *STA of Baltimore.* In the present case, the distributions were conditioned not only on prior service, but also on continuing employment at the time of the sale to Tyson Foods. In addition, the amount received by each employee was a function of the employee's

length of service, value of service rendered, and prior wages. *See also Marquette Univ. v. United States,* 645 F.Supp. 1007, 1013–14 (E.D.Wis.1986) (concluding that bonuses, the sizes of which were tied to the recipients' job performances and ranks, were wages subject to FICA and FUTA).

The Trust also argues that FICA and FUTA are inapplicable here because the Lane Companies employees did not work for the Trust, and thus the Trust was not an "employer." This argument also is without merit. The Trust need not have employed the Lane Companies employees in a legalistic sense to be treated as their employer for FICA and FUTA purposes. *See Otte v. United States,* 419 U.S. 43, 50–51, 95 S.Ct. 247, 252–53, 42 L.Ed.2d 212 (1974). Furthermore, courts should resolve disputes over whether an employer-employee relationship exists with an eye toward effecting the Acts' remedial purposes. *See Breaux & Daigle, Inc. v. United States,* 900 F.2d 49, 52 (5th Cir.1990) (explaining facts weighing in favor of a finding that crabmeat pickers were employees rather than independent contractors). The Trust ran the Lane Companies and clearly had control over the wages paid to the employees. In fact, one of the Trust's first acts when it assumed control over the Lane Companies was to cancel retroactively a pay cut that had been imposed on the employees by the Lanes. Moreover, the establishment of the Trust itself was predicated on the trustees' taking over the operations of the Lane Companies, and the Trust managed and controlled the Lane Companies in every meaningful way, from the day-to-day affairs of the Companies through, ultimately, their sale. It would elevate form over substance were we to conclude that the Trust did not function as an employer during the period it owned the Companies' stock.

The Trust relies on *R.J. Reynolds Tobacco Co. v. United States,* 149 F.Supp. 889, 894 (Ct.Cl.), *cert. denied,* 355 U.S. 893, 78 S.Ct. 266, 2 L.Ed.2d 191 (1957), in which the court held that the corporation could not adjust its taxable income by deducting as compensation under the Internal Revenue Code distributions made to employee-stockholders because the distributions were in proportion to the employees' stockholdings and there was no link between the value of the services rendered and the amounts distributed. The Trust's reliance is misplaced. As we already have pointed out, the facts of the present case plainly show that the distributions in this case were linked to location, prior wages, length of service, and other factors traditionally used to determine employee compensation, and were not just "determined by general considerations of fairness," as the Trust contends. Brief for Appellee at 27.

The Trust also relies on Rev.Rul. 60–89, 1960–1 C.B. 379, in which an actors guild, in its capacity as exclusive bargaining agent for movie actors, received payments from movie producers and others in consideration for, among other things, allowing to be televised previously produced movies in which guild members appeared. The Commissioner ruled the guild's distributions of these payments to the movie actors were not "wages" for FICA and FUTA purposes. Because of the obvious differences between the guild's distributions to its actor-members and the situation in the present case, we find that the ruling is inapplicable and of no persuasive effect.

Finally, the Trust argues that the distributions were not wages because the payments were not bargained-for; the Trust was established merely to hold the Lane Companies' stock, which had a negative book value when placed in the Trust, and not to provide compensation to the employees; the trustees had absolute discretion over the payments; union status was not considered when the payments were calculated and the distributions were merely a function of job classification and length of employment; the distributions were of the proceeds of the sale, and not of corporate income; and the payments were made when the Trust no longer controlled the Lane Companies. These factors, however, either alone or in combination, are insufficient to preclude the conclusion that the distributions constituted "wages" as that term is defined for purposes of FICA and FUTA.

### III.

For the reasons stated above, the judgment of the District Court is reversed, and

the court is directed to enter judgment denying the Trust's claim for a refund and dismissing the Trust's lawsuit.