### ASSOCIATED ELECTRIC COOPERATIVE, INC., Plaintiff,

v.

### The UNITED STATES, Defendant.

### No. 96–636T.

United States Court of Federal Claims.

Feb. 5, 1999.

---

Jason A. Reschly, Kansas City, MO, for plaintiff. Mark D. Hinderks, Stinson, Mag & Fizzell, P.C., of counsel.

Benjamin C. King, Washington, DC, with whom was Assistant Attorney General Loretta C. Argrett, for defendant.

---

**1.** Plaintiff purchased the Prairie Hill coal mine, together with all of its facilities, from Peabody Coal Company in 1977. In 1980 plaintiff assumed full operational control of the facilities, largely with the miners previously employed by Peabody. The "Thomas Hill Energy Center" refers to Thomas Hill Units 1, 2, and 3, as well as the Prairie Hill mine.

## OPINION

MILLER, Judge.

This matter is before the court after trial. The sole issue under consideration is whether termination payments made by the corporate taxpayer to certain of its employees are subject to liability for taxes under the Federal Insurance Contributions Act, 26 U.S.C.A. ("I.R.C.") §§ 3101–3128 (West 1989 & Supp. 1998) ("FICA").

## FACTS

Trial was supplemented by the parties' stipulation of facts. Associated Electric Cooperative, Inc. ("plaintiff"), is a rural electric generation and transmission cooperative, with its principal place of business in Springfield, Missouri. Plaintiff generates electricity through the operation of two coal-fired steam electric generation plants located at New Madrid, Missouri, and three coal-fired steam electric generation plants located near Thomas Hill, Missouri. In 1990 Congress enacted the Clean Air Act Amendments (the "Act"), Pub.L. No. 101–549, 104 Stat. 2399, which exacted limits on the amount of sulfur dioxide emissions from coal fired electric generation plants, such as those operated by plaintiff. The emissions reductions mandated by the Act were scheduled to occur in two parts, Phase I commencing January 1, 1995, and Phase II commencing January 1, 2000.

Prior to 1992 plaintiff purchased coal from a mine in Illinois to supply fuel for energy production at the plants in New Madrid. The Prairie Hill coal mine, located on site, supplied coal for the three units at Thomas Hill.[1] Owned and operated by plaintiff, the Prairie Hill mine employed approximately 440 workers, of whom approximately 330 were represented by the United Mine Workers Association (the "UMWA").

The Illinois and local coal plaintiff utilized for energy production had a high sulfur content, rendering the sulfur dioxide emissions from combustion in excess of those permissible under the Act. By resolution, on Janu-

ary 29, 1992, plaintiff's Board of Directors (the "Board") instructed plaintiff's staff to establish a public involvement process whereby plaintiff could evaluate the costs and benefits associated with the various options through which plaintiff could comply with the Act. Plaintiff could reduce the level of sulfur dioxide emission by constructing and installing "scrubbers"[2] on plants, or by burning coal purchased from mines in Wyoming ("Western coal"), which contained acceptably low levels of sulfur.

Because the installation of scrubbers permitted the continued utilization of locally mined coal, the UMWA supported the option contemplating full mine production at Prairie Hill until 2016 and the installation of scrubbers on Thomas Hill Units 1 and 2 by 1995.[3] The UMWA formally opposed any option that resulted in closing or downsizing coal mining operations at the Thomas Hill Energy Center and, in particular, conversion to Western coal. Plaintiff's largest customer, Noranda Aluminum, Inc., as well as plaintiff's member-owners, urged plaintiff to pursue the option that would provide reliable electric service at the lowest cost. In practical terms this option envisioned closing the Prairie Hill mine in 1995, switching all units to Western coal in 1995, shutting down the Unit 3 scrubber in 1995, and reducing jobs to 167 in 1995 and to zero in 2009.

The public participation process, including the several options available to plaintiff for compliance with the Act, each option's economic impact, and the positions of interested parties was memorialized in a "Record of Decision regarding Future Fuel Supply for Thomas Hill Energy Center" dated May 28, 1992. The Record of Decision incorporated the following resolution of the Board, rendered May 26–27, 1992:

RESOLVED:

WHEREAS, in accordance with the directions of this Board of Directors, the Associated staff has completed the Public Involvement Process regarding the Clean Air Act and the cooperative's future fuel supply at the Thomas Hill Energy Center; and,

WHEREAS, this Board of directors has examined, and taken into consideration, the information, views, and suggestions produced as a result of such process, and thereafter did cause to be prepared it's FINAL RECORD OF DECISION;

NOW THEREFORE IT BE RESOLVED, that the General Manager and staff are authorized and directed to implement a plan which will:

(1) continue to burn Missouri coal, blended with western coal, in Thomas Hill Unit # 3 until January 1, 1998; and,

(2) fuel Thomas Hill Units # 1 and # 2 with low sulfur western coal [by January 1, 1995].

That the decision to continue to mine Missouri coal shall be reevaluated in 1997 taking into account the performance of the cost of low sulfur western coal, and the performance of the cost of the limited Missouri mining operation. . . .

The adoption of this compromise plan phased out two draglines by January 1, 1995, and the third and final dragline by January 1, 1998. Because this plan contemplated the closure of the Prairie Hill mine by January 1, 1998, attendant to the conversion from local to Western coal as the primary fuel source for the Thomas Hill Energy Center, plaintiff commenced negotiations with the UMWA in the summer of 1992 regarding a severance package for those employees subject to the reduction in workforce that would commence at the end of 1994. Plaintiff considered several severance arrangements, including a computation based on an employee's length of service or simply a lump sum. At the same time, plaintiff also began negotiations with fuel suppliers for Western coal and with the railroads regarding its transportation. Through the course of these negotiations, plaintiff discovered that the economic benefit associated with conversion to Western coal

---

**2.** A scrubber is a pollution control device that collects sulfur dioxide emissions before they pass into the air.

**3.** Unit 3, the newest and largest of Thomas Hill's three units, was equipped with a scrubber.

far exceeded that initially anticipated and accounted for in the Record of Decision.[4]

In light of the significant cost savings that could be realized by immediately ceasing Missouri coal mining activities, plaintiff and its Board considered alternatives to the course announced in the Record of Decision. Initially, the Board seriously examined two options prepared by plaintiff's management; both considered a reduction in workforce supporting plaintiff's mining operations in advance of the reductions announced in the Record of Decision. Each option was presented in a written report to the Board and referred to as "Case 1" and "Case 2." Case 1 proposed that plaintiff would continue mining until July 1997, during which time plaintiff's options involving Western coal would be under periodic assessment. Case 1 assumed "a reduction of represented mine operating personnel from 294 in 1992 to 274.5 (reduction of 19.5 employees) in 1993, and a reduction in non-represented personnel from 103.1 to 80.5 (reduction of 22.6 employees)." Case 2 considered closing two draglines at the end of 1994 and operating the remaining dragline through 1997, at which time either the dragline would be moved or mining operations would cease. The reduction in represented labor force in 1993 under Case 2 exceeded that of Case 1 by 18.5 employees, for a total of 38 represented mine employees. The non-represented work force would be reduced to 79.1 employees, a reduction of 24, or 1.4 greater than that in Case 1. Furthermore, in 1995, the represented mine operation's workforce would be reduced by 155 employees, 16 fewer than in Case 1; non-represented employees would be reduced by 39.8 employees to a total of 38.3, the same number as in Case 1.

Among the arguments against adopting Case 2, the report noted that "[m]ore employees [would be] impacted with more potential for labor problems" and that Case 2 "[s]ends signal to mine employees that [plaintiff does not] expect to operate the mine beyond 1997." Nevertheless, the report recommended that the Board adopt the Case 2

mining plan and that certain labor relations matters be addressed. In particular, the report addressed the following concern:

> [T]his report will not be well received by employees. Many believe their jobs to be secure through 1994, that a limited mining operation will continue through 1997, and that post 1997 mining operations are a distinct possibility. Announcement of an accelerated downsizing schedule that includes involuntary separations, coupled with the likelihood that mining operations will cease earlier than previously thought, will destabilize labor/management relations. A severe destabilization has the potential to disrupt mining operations, power generation, and plant conversion schedules for a protracted period of time.

Instead of adopting Case 1 or Case 2, on October 28, 1992, the Board authorized its management to offer a voluntary severance package to the employees of the Thomas Hill mine. After extensive and occasionally heated negotiations, plaintiff and the UMWA executed on November 24, 1992, the "1992 Interim Agreement Between Associated Electric Cooperative, Inc. and the International Union, United Mine Workers of America" (the "Me, Too Agreement") and the "Income Security Agreement Between United Mine Workers and Associated Electric Cooperative, Inc." (the "Income Security Agreement").

The Income Security Agreement included both an involuntary separation program, or severance plan, drafted in accordance with the Record of Decision, and a voluntary "early out" severance package. Under the severance plan, employees involuntarily laid off would receive "a one time severance payment equal to one months' earnings for each full year of employment with the Cooperative." The voluntary "early out" plan entitled eligible employees to the same arrangement described in the severance package, yet with a supplemental cash payment equal to twelve

---

4. James J. Jura, plaintiff's General Manager and Chief Executive Officer, testified that, as of the date of his testimony, November 12, 1998, the fuel cost associated with the Western coal was

$14.00 per ton—$4.00 for fuel and $10.00 for transportation. In February 1992, the last month plaintiff mined coal locally, the cost to plaintiff was $38.00 per ton.

months' earnings.[5] The enrollment period for the "early out" plan commenced on November 30, 1992, and concluded on December 18, 1992. Extended health and related insurance coverage were provided under both plans at the levels specified by the 1988 National Bituminous Coal Wage Agreement (the "1988 National Agreement") or by the successor National Agreement upon the former's expiration. Neither the severance plan nor the "early out" package recognized an employee's services provided to the predecessor mine operator.

By the terms of the Me, Too Agreement, plaintiff and the UMWA agreed to be bound by and comply with the terms of the 1988 National Agreement. In addition, the UMWA relinquished its right to strike upon the expiration of the 1988 National Agreement. Plaintiff considered the execution of the Me, Too Agreement critical to completing the necessary modifications and improvements on a timely basis so as to permit it to promptly convert to burning the more cost efficient Western coal. In conjunction with the voluntary "early out" plan, plaintiff viewed the Me, Too Agreement as a safeguard against "potential violence and labor unrest since the workers had made the voluntary decision to resign and thus did not bear [plaintiff] the attendant animosity attached to lay offs." Plf's Br. filed Oct. 22, 1998, at 5.

Of the 444 employees eligible for the voluntary "early out" plan, 340 employees elected to participate; of those participating, 268 employees were represented by the UMWA, and 72 were non-union members. Because of the overwhelming response, plaintiff ceased its mining operations effective February 2, 1993. Those employees who did not participate in the "early out" plan continued employment with plaintiff and were retained in large part to complete the required reclamation of the mined land. The reclamation continued from 1993 to the spring of 1998. The employees laid off upon the completion of the reclamation received benefits prescribed under the involuntary separation plan.

On or about February 19, 1993, plaintiff paid FICA taxes pursuant to I.R.C. § 3111 (imposing on employer excise tax with respect to those in employ following percentage of wages paid), with respect to payments made to its employees accepting the voluntary "early out" plan for the tax period beginning on January 1, 1993, and ending on March 31, 1993. Plaintiff withheld federal income tax under I.R.C. § 3402 (requiring employer to deduct and withhold a tax from wages) from these employees on the payments and paid such amounts for the tax period beginning on January 1, 1993, and ending on March 31, 1993. Plaintiff also withheld FICA taxes from these employees under I.R.C. § 3101(imposing tax on income of every individual based on percentage of wage with respect to employment) on the payments and paid such amounts for the tax period beginning on January 1, 1993, and ending on March 31, 1993. The taxes paid totaled $2,835,111.86.

On or about April 30, 1993, plaintiff filed its federal quarterly tax return with the Internal Revenue Service (the "IRS") reporting its total FICA taxes for the quarter, which included plaintiff's and the employees' share of FICA taxes on the voluntary "early out" payments. Plaintiff reported and paid $4,323,617.56 as the total amount of FICA taxes owed for the quarter ending March 30, 1993. On or about May 12, 1993, plaintiff requested a refund from the IRS in the amount of $2,835,111.86 on its own behalf and on behalf of its employees. The IRS denied plaintiff's request for refund by letter dated June 30, 1995. Plaintiff filed its complaint in the Court of Federal Claims seeking a refund of the FICA taxes paid.

## DISCUSSION

■ Whether the voluntary "early out" payments made by plaintiff to its employees

---

**5.** Employees accepting the voluntary severance package also were afforded the opportunity to be listed on a supplemental panel, providing such employees a reasonable expectation of recall subject to limited conditions. The memorandum setting forth the terms of the agreement included the following: "Completion of a panel form does not alter nor change the fact that requests for the Early–Out Plan were voluntary actions on the part of employees nor is it to be construed as establishing early out separations as voluntary layoffs."

constitute "wages" for the purposes of FICA taxation, *see* I.R.C. § 3121(a), is pivotal. If such payments are wages, then the payments are taxable and plaintiff is not entitled to a refund. If such payments are not wages, but, rather, a type of remuneration beyond the scope of that contemplated for the purposes of FICA, then plaintiff is entitled to a refund.

### 1. *Interpretation of "wages"*

Under I.R.C. § 3102, every employer is required to deduct social security taxes from wages paid to employees. Similarly, I.R.C. § 3111 mandates an excise tax on the employer based on a percentage of wages paid by the employer to the employee. For the purpose of determining FICA tax liability, "wages" are defined as "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash...." I.R.C. § 3121(a). The provisions that follow set forth exceptions to this general rule. "Employment," per I.R.C. § 3121(b), is defined as "any service, of whatever nature, performed ... by an employee for the person employing him...."

Although no court has considered the particular type of payment at issue in the instant case, numerous courts have construed I.R.C. § 3121 with respect to similar payments. In *Social Security Board v. Nierotko*, 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718 (1946), the Supreme Court rendered an interpretation of "wages" and "employment" as defined in the Social Security Act of 1935, ch. 531, sec. 210, 49 Stat. 620, 625.[6] The payment at issue in *Nierotko* involved an award of back pay to an employee for a period during which he was wrongfully separated from his job. The Court stated:

> The petitioner urges that [he] did not perform any service.... We are unable, however, to follow the Social Security Board in such a limited circumscription of the word 'service.' The very words 'any service ... performed ... for his employer,' with the purpose of the Social Security

Act in mind import breadth of coverage. They admonish us against holding that 'service' can be only productive activity. We think that 'service' as used by Congress in this definitive phrase means not only work actually done but the entire employer-employee relationship for which compensation is paid to the employee by the employer.

*Id.* at 365–66, 66 S.Ct. 637 (footnote omitted).

The notion of an "employer-employee relationship" continues to be recognized as the touchstone for determining if a particular payment is subject to FICA taxation. In addition, courts recently construing I.R.C. § 3121 have followed *Nierotko* by affording the terms "wages" and "employment" broad, inclusive coverage. *See, e.g., Mayberry v. United States*, 151 F.3d 855, 860 (8th Cir. 1998); *Hemelt v. United States*, 122 F.3d 204, 209 (4th Cir.1997); *Lane Processing Trust v. United States*, 25 F.3d 662, 665 (8th Cir.1994). *But see Dotson v. United States*, 87 F.3d 682, 689–90 (5th Cir.1996) ("The [payment] compensated for 'loss in earning capacity,' not for services already performed, and is thus not subject to wage taxation.") (citing *Eirhart v. Libbey–Owens–Ford Co.*, 1991 WL 211235 (N.D.Ill.), *aff'd*, 996 F.2d 837 (7th Cir.1993)).

Plaintiff contends that defendant's interpretation of wages under I.R.C. § 3121 is overbroad, directing the court's attention to the Supreme Court's decision in *Rowan Cos. v. United States*, 452 U.S. 247, 254, 101 S.Ct. 2288, 68 L.Ed.2d 814 (1981), and *Royster Co. v. United States*, 479 F.2d 387, 390 (4th Cir.1973). According to plaintiff, these cases support the proposition that the term "wages" is narrower than the term "income," and that wages are merely one form of income.

At issue in *Rowan* was whether the value of meals and lodging provided to employees at the convenience of the employer should be included in the social security wage base. The Court dismissed arguments pressed by the Government that FICA composed a dis-

---

**6.** The current formulation of "wages" and "employment" for the purposes of FICA originated in the Social Security Act of 1935; the definitions have been retained to this day essentially unchanged.

tinct system of taxation to which the rules of income taxation do not apply. *See Rowan,* 452 U.S. at 257, 101 S.Ct. 2288. Not long after it issued, Congress overrode the decision in *Rowan* by enacting the Social Security Amendments of 1983, Pub.L. 98–21, 97 Stat. 65. The Senate Report, discussing these amendments, states, in pertinent part:

> The social security program aims to replace the income of beneficiaries when that income is reduced on account of retirement and disability. Thus, the amount of "wages" is the measure used both to define income which should be replaced and to compute FICA tax liability. Since the social security system has objectives which are significantly different from the objectives underlying the income tax withholding rules, your Committee believes that amounts exempt from income tax withholding should not be exempt from FICA unless Congress provides an explicit FICA tax exclusion.

S.Rep. No. 98–23, at 42 (1983), *reprinted in* 1983–2 U.S.C.C.A.N. 143, 299.

Thus, although the legislative history of the amendments is not inconsistent with plaintiff's argument that "wages" may be more narrowly defined than "income," or that the purposes behind the social security system differ from those behind the rules of income taxation, plaintiff's overall position is not advanced significantly. Mere recognition that all remuneration from employer to employee may not constitute wages for purposes of FICA does not necessarily render the payments at issue beyond the scope of FICA taxation.[7] Moreover, it is undisputed that the payments at issue do not fall within any of the exceptions to wages identified in I.R.C. § 3121(a).

Plaintiff also relies on two earlier Revenue Rulings in which the IRS determined that benefits flowing from an employer to an employee do not constitute wages for FICA purposes. The IRS held that a lump-sum payment received by an employee as consideration for the cancellation of an employment contract, although part of gross income for federal income tax purposes does not constitute wages for federal employment and income tax withholding purposes. *See* Rev. Rul. 58–301, 1958–1 C.B. 23; Rev. Rul. 55–520, 1955–2 C.B. 393.

Subsequent revenue rulings have narrowed and distinguished these earlier interpretations of "wages" as subject to FICA tax liability. In Rev. Rul. 75–44, 1975–1 C.B. 15, the IRS concluded that a lump-sum payment received by an employee as consideration for the relinquishment of seniority rights under a collective bargaining agreement constituted wages. One of the primary distinctions drawn by the IRS recognized that the earlier rulings involved the cancellation of an employment contract, which bound the parties to a particular period of time, and that Rev. Rul. 75–44, like the instant case, contemplated an employment relationship between the parties that was to continue indefinitely. Similarly, Rev. Rul. 74–252, 1974–1 C.B. 287 determined that a "dismissal payment[ ] made to an employee, following his involuntary termination, under the terms of a 3–year contract permitting the employer to terminate the employment relationship provided the employee is paid an amount equal to an additional 6–months salary ... are wages for purposes of the FICA."

Plaintiff also contends that it would be an "absurd" interpretation of "wages" as defined in I.R.C. § 3121(a) if "payment to encourage

---

**7.** The Court's discussion in *Rowan* relied, in part, on its decision in *Central Illinois Public Service Co. v. United States,* 435 U.S. 21, 98 S.Ct. 917, 55 L.Ed.2d 82 (1978), which considered whether an employer should have included in "wages" for income tax withholding reimbursements provided to employees for meal expenses on company travel not requiring overnight stays. The Court held that the reimbursements need not be included in wages, even though the reimbursements did constitute income to the employees under I.R.C. § 3401(a). Similarly, the court in *Royster* concluded that reimbursements to employees for

the cost of meals did not constitute wages subject to FICA; the Federal Unemployment Tax Act pursuant to 26 U.S.C.A. §§ 3301–3311 (West 1989 & Supp.1998); or income tax withholding. *See Royster,* 479 F.2d at 390. Like *Rowan, Central Illinois* and *Royster* support plaintiff's contentions only insofar as the proposition that the term "wages" is defined more narrowly than "income." In addition, these three cases are distinguishable from the instant case because the reimbursements were not calculated with respect to earnings and length of service, as were the payments plaintiff made.

an employee not to work" is considered "a payment for services performed for the employer." Plf's Br. filed Oct. 22, 1998, at 10. Plaintiff's literal, restrictive reading of I.R.C. § 3121 overlooks the import of *Nierotko* and its progeny. Services performed need not be linked to a particular or productive activity to fall within FICA tax liability. *See Nierotko,* 327 U.S. at 365–66, 66 S.Ct. 637; *Gerbec v. United States,* 164 F.3d 1015, at 1026 (6th Cir.1999) (" '[R]emuneration for employment' includes certain compensation in the employer-employee relationship for which no actual services were performed.").

Plaintiff's reliance on *Eirhart v. Libbey–Owens–Ford Co.,* Nos. 76C 3182, 78C 2042, 1991 WL 211235 (N.D.Ill. Oct. 7, 1991), for "the general rule that payments made for reasons other than the performance of services do not constitute wages," Plf's Br. filed Oct. 22, 1998, at 11, extends that court's holding beyond its proper scope. *Eirhart* involved damages paid to a class of employees hired into temporary, rather than full-time, employment at one of the taxpayer's plants in violation of a consent decree. The court concluded that the payments at issue represented compensation for "wages that could have been earned [from other employment] but for [plaintiff's] wrongful conduct." *Id.* at *2. This decision did not establish a "general rule" that payments not directly related to the performance of a productive service are not subject to taxation under FICA, as the court in *Eirhart* acknowledged, stating that payments are wages for the purposes of employment tax withholding "where an employer is responsible for back pay to its own employee (even though by definition the employee has not actually rendered services during the period) . . . ." *Id.* at *1.

The contention that the instant facts parallel certain Revenue Rulings concerning supplemental unemployment pay benefits ("SUB pay"), as well as strike and lockout benefits, is equally unpersuasive. In Rev. Rul. 56–249, 1956–1 C.B. 488, the IRS announced a limited exception to the definition of wages for FICA; the Federal Unemployment Tax Act, 26 U.S.C.A. §§ 3301–3311 (West 1989 & Supp.1998) ("FUTA"); and federal income tax withholding purposes for payments made upon the involuntary separation of an employee from the service of the employer, but only if the payments are designed to supplement the receipt of state unemployment compensation. Although the amount of benefits paid was related, in part, to an employee's wage rate at the time of layoff and level of seniority, also included in the payment calculation were factors not typically associated with wages, such as the size of the state unemployment benefit to which the employee was entitled, and the amount of other remuneration received that was allowable under state unemployment compensation law, marital status, and number of dependents. *See id.* In a subsequent ruling, the IRS refined its treatment of SUB pay, concluding that SUB pay "must be linked to the receipt of state unemployment compensation and must not be received in a lump sum in order to be excludable from the definition of wages." Rev. Rul. 90–72, 1990–2 C.B. 211. At no point in this litigation has plaintiff taken the position that the payments at issue fall within the relatively narrow exception to wages carved out for SUB pay.

The issues involved in the rulings cited by plaintiff concerning strike benefits were whether a union could be considered an employer of its members and whether benefits passing from a union to its members could be considered wages for FICA, FUTA, and income tax withholding purposes. Considered collectively, these rulings support the rather orthodox proposition that only union members that are paid for actual services performed related to a strike are subject to FICA tax liability, and that members receiving benefits on the basis of need, or who are assigned no duties whatever, are not subject to FICA tax liability. *See* Rev. Rul. 75–475, 1975–2 C.B. 406 (strike benefits paid to union members for actual duty hours at an hourly rate are wages for purposes of FICA); Rev. Rul. 68–424, 1968–2 C.B. 419 (strike benefits paid to union members, some of whom perform no duties, are not wages under FICA but includable in gross income); Rev. Rul. 58–139, 1958–1 C.B. 14 (strike and lockout benefits distributed on basis of need includable in gross income, but do not constitute wages for purposes of federal employment taxes).

In sum, the foregoing revenue rulings and cases cited by plaintiff fail to provide a basis for employing a concept of wages narrower than that contemplated by Congress or the Supreme Court. Although the concept of an employer-employee relationship as it is used to determine whether a certain payment constitutes wages has been refined since *Nierotko,* no legislative, administrative or judicial authority suggest that the employer-employee relationship test is no longer viable.

### 2. The "early out" plan payment methodology

The method by which plaintiff computed the "early out" payments supports defendant's contention that the payments fall within the statutory and regulatory definition of wages. James J. Jura, plaintiff's General Manager and Chief Executive Officer, testified that the "early out" payments were formulated with fairness in mind and with the objective of inducing plaintiff's employees to resign voluntarily. Mr. Jura also stated that the eligible employees had been paid for all prior services rendered. Although conceding that the method of calculation of a particular payment is a factor in determining whether such payments constitute wages for FICA tax purposes, plaintiff contends that payments based on length of service and pay rate are not wages *per se.* Plaintiff thus argues that the method of calculation was selected "because it was the most equitable and acceptable method to utilize to encourage voluntary acceptance of the package by the employees and arrived at a cost it determined to be reasonable to pay its employees." Plf's Br. filed Oct. 22, 1998, at 13.

Both plaintiff and defendant rely on decisions issued by several of the federal circuit courts of appeals in which taxpayers sought a refund from income and wage taxes paid on a class action settlement award entered in litigation under the Employee Retirement Income Security Act of 1974, 29 U.S.C.A.

§§ 1132(a), 1140 (West 1999). *See Gerbec,* 164 F.3d 1015; *Mayberry,* 151 F.3d at 855; *Hemelt,* 122 F.3d at 204; *Dotson,* 87 F.3d at 682. These cases grew out of consolidated class action suits filed by over 5,000 employees of Continental Can Company, alleging that the company engaged in laying off employees before pension rights vested in order to reduce projected pension liabilities. A special master distributed the funds in accordance with a plan incorporating two separate components: 1) a Basic Award " 'defined by age and years of service at layoff,' that was designed to 'compensate for the dignitary loss suffered by the alleged discrimination on grounds of age and work experience as employees reached the Continental pension benefit thresholds,' " and 2) an Earnings Impairment Additur "designed not only to provide compensation for loss in earnings capacity, but also 'to approximate ... the long-term loss in employment prospects that faced most former Continental employees whose skills and opportunities were diminished for their lifetimes.' " *Gerbec,* 164 F.3d at 1018.

Plaintiff's efforts to distinguish the settlement payment in the class action from the payments at issue in the instant matter, while thoughtful, do not overcome the reasoning supporting each court's rulings.[8] The courts in *Gerbec, Mayberry,* and *Hemelt* recognized that the phrase "remuneration for employment," as it appears in I.R.C. § 3121(a), should be interpreted broadly, and that the test for determining if a certain payment constituted wages for FICA purposes, in accordance with the Supreme Court's decision in *Nierotko,* turns on the interpretation of "service" within the context of the entire employer-employee relationship. *See, e.g., Gerbec,* 164 F.3d at 1026 ("We hold that the phrase 'remuneration for employment' includes certain compensation in the employer-employee relationship for which no actual services were performed."). Further supporting the conclusion that the settlement

8. A close examination of prior courts' analyses is unaffected by the fact that their holdings are not consistent. The courts in *Mayberry* and *Hemelt* concluded that FICA taxes were properly withheld, without qualification. Reaching a slightly different conclusion, the Sixth Circuit stated that "any damages attributable to wages [that the

class members] would have received had they not been wrongly terminated should also be subject to the FICA taxes they would have paid on those wages had they not been wrongly terminated." *Gerbec,* 164 F.3d at 1026. Although the result in *Dotson* is favorable to plaintiff, the reasoning was not the same as plaintiff employs.

payments were subject to federal employment taxes, these courts afforded significant weight to the fact that the method used to compute the award included the length of each employee's tenure with the company and rate of pay. Other cases cited by defendant, although involving different payment types, revealed similar analyses to determine if the payments were subject to FICA tax. *See Sheet Metal Workers Local 141 Supplemental Unemployment Benefit Trust Fund v. United States*, 64 F.3d 245, 251 (6th Cir. 1995) (agreeing with other circuits that "eligibility requirements prove the most accurate test to determine whether a payment is truly in consideration for services"); *Lane Processing Trust*, 25 F.3d at 666 (reasoning that payments constituted wages taxable for purposes of FICA because "the distributions in this case were linked to location, prior wages, length of service, and other factors traditionally used to determine employee compensation, and were not just 'determined by general considerations of fairness....'"); *STA of Baltimore–ILA Container Royalty Fund v. United States*, 621 F.Supp. 1567, 1571 (D.Md. 1985) (holding pay constituted wages under I.R.C. § 3121(a) because pay available only to those members who worked requisite number of hours).

The payments at issue in this case were based on each employee's length of service with plaintiff or seniority, as well as current rate of pay. Plaintiff rejected a proposal under which employees would have received compensation based on length of service at the mine, which would have resulted in compensating employees for services rendered to the owner of the mine that preceded plaintiff. It is undisputed that the payments constituted income for the employees receiving them, and that the payments did not fall within any of the exclusions set forth in I.R.C. § 3121(a). Considering the "early out" plan's eligibility requirements and method of computation, the weight of authority suggests that payments at issue arose out of the employer-employee relationship, and thus constitute wages under I.R.C. § 3121(a).[9]

3. *Surrender of rights in exchange for payments*

■ Significant testimony was adduced regarding the nature of rights relinquished by plaintiff's employees in consideration of the benefits offered union members under the "early out" plan. Plaintiff contends that the UMWA relinquished its right to strike, a right that the UMWA could have exercised upon the expiration of the 1988 National Agreement. When questioned whether plaintiff would have offered its employees the "early out" plan without simultaneously executing the Me, Too Agreement, Mr. Jura responded "No, ... getting the 'Me, Too' was part of the benefit [plaintiff] should receive for offering what we did under the [early out] package." *Associated Electric Cooperative, Inc. v. United States*, No. 96–636T, Transcript of Proceedings, at 62 (Fed. Cl. Nov. 12, 1998). Both Mr. Jura and O.B. Clark, President of the Board, testified that the execution of the "early out" package and

9. Plaintiff's assertion that certain cases cited by defendant are irrelevant because they did not involve payments for the purpose of inducing the employee to voluntarily resign and perform no future services for the employer is misguided. These cases do not recognize the taxpayer's subjective intent as the proper means for classifying a particular payment as wages for the purposes of FICA. Were the taxpayer's intent dispositive, no longer general would be the rule that " '[t]he tax laws must be construed to favor—indeed require—the collection of concededly due tax revenues.' " *NYSA–ILA Container Royalty Fund*, 847 F.2d at 53 (quoting *NYSA–ILA Container Royalty Fund v. Commissioner of IRS*, 684 F.Supp. 783, 786 (S.D.N.Y.1987)).

Equally misguided is defendant's contention that the "early out" payments are analogous to involuntary dismissal payments. For the purpose of determining whether the payments at issue should be characterized as voluntary or involuntary, it matters not that plaintiff contemplated the permanent closure of its mining operations in 1997, likely resulting in the termination of all mining jobs. At trial Mr. Jura testified that downsizing of termination mining activity would not necessarily lead to layoffs, as plaintiff had the ability to utilize former mine employees for other responsibilities, including mine reclamation duties. To the extent that involuntary dismissal was contemplated under the Case 1 or Case 2 scenarios presented to the Board, neither was adopted. The evidence presented unequivocally supports the finding that the employees accepting the "early out" offer did so voluntarily, and that the potential existed for continued indefinite employment with plaintiff for those employees who did not take advantage of the plan.

Me, Too Agreement reflected plaintiff's concern that labor peace be maintained throughout plaintiff's process of conversion to Western coal and that the "early out" payments were not offered in consideration for prior services.

With these facts in mind, plaintiff asserts that "[t]he Service has consistently ruled that payments made by an employer to an employee for the surrender of rights not acquired through his or her previous performance of services do not constitute wages for FICA tax purposes." Plf's Br. filed Oct. 22, 1998, at 14. Plaintiff also maintains that "the key issue ... is whether the rights relinquished were acquired through the prior performance of services," *id.* at 15, and that the employees' right to strike was not acquired as a result of prior performance of services, but as a result of the simple termination of the 1988 National Agreement. Plaintiff relies primarily on Rev. Rul. 58–301, 1958–1 C.B. 23, in which the IRS held that a lump-sum payment received by an employee for the premature cancellation of his five-year employment contract constituted gross income, but not wages for federal employment and withholding tax purposes.

The IRS has distinguished and narrowed this Revenue Ruling on several occasions, as discussed above. An employee's relinquishment of seniority rights acquired through prior service in exchange for a lump-sum payment is subject to FICA taxation. *See* Rev. Rul. 75–44, 1975–1 C.B. 15. In addition, a payment made to an employee following his termination under a fixed-period contract permitting the employer to terminate the employment relationship constitutes wages for purposes of FICA, provided the employee is paid an amount equal to an additional six months salary. *See* Rev. Rul. 74–252, 1974–1 C.B. 287. Plaintiff correctly points out that the rights surrendered in the instant case arose out of the collective bargaining agreement and that, on this basis, these later rulings can be distinguished. Rev. Rul. 75–44 involved the surrender of rights that were acquired not through an agreement, but

through prior service, and the payments in Rev. Rul. 74–252 "were made pursuant to the provisions of the contract" and in the nature of a dismissal payment, "rather than as consideration for the relinquishment of interests the employee had in his employment contract in the nature of property." *See* Rev. Rul. 74–252, 1974–1 C.B. 287. Notwithstanding plaintiff's reasonable discussion of the foregoing, significant factual differences remain between the ruling on which plaintiff relies and the facts of the instant case.

Although the court was impressed with the veracity and sincerity of the testimony presented at trial regarding the reasons for which plaintiff executed the "early out" plan, the operative facts suggest that the "early out" plan was not devised and executed for the limited purpose of securing from the UMWA a promise not to strike upon the expiration of the 1988 National Agreement. This agreement expired on January 31, 1993, which was also the last day that employees accepting the "early out" plan were permitted to work. Therefore, for those employees actually taking advantage of the plan, the right to strike was never at issue because their termination would have occurred prior to the date on which that right would have vested, notwithstanding the signing of the Me, Too Agreement.[10] The fact that the plan was offered to non-union employees not covered by the 1988 National Agreement further underscores the possibility that plaintiff may have executed the "early out" plan for economic reasons unrelated to those associated with preventing labor unrest.

## CONCLUSION

Accordingly, based on the foregoing, the Clerk of the Court shall enter judgment for defendant.

**IT IS SO ORDERED.**

No costs.

---

10. Although the individual employees accepting the "early out" plan cannot be said to have relinquished their right to strike pursuant to the execution of the Me, Too Agreement, this is not true of the UMWA as a collective bargaining unit or those UMWA employees remaining under the employ of plaintiff after January 31, 1993.