## ASSOCIATED ELECTRIC COOPERATIVE, INC., Plaintiff–Appellant,

v.

## UNITED STATES Defendant–Appellee.

### No. 99–5058.

United States Court of Appeals, Federal Circuit.

Sept. 28, 2000

Mark D. Hinderks, Stinson, Mag & Fizzell, P.C., of Leawood, Kansas, argued for plaintiff-appellant. Of counsel was Jason A. Reschly, Stinson, Mag & Fizzell, P.C., of Kansas City, Missouri.

Michelle B. O'Connor, Attorney, Tax Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Loretta C. Argrett, Assistant Attorney General; and Kenneth L. Greene, Attorney.

Before NEWMAN, Circuit Judge, ARCHER, Senior Circuit Judge, and RADER, Circuit Judge.

ARCHER, Senior Circuit Judge.

## DECISION

Associated Electric Cooperative, Inc. (Associated) appeals the judgment of the United States Court of Federal Claims in favor of the United States (the government) dismissing Associated's claim for a refund of Federal Insurance Contributions Act (FICA) taxes.[1] We affirm.

1. *See Associated Elec. Coop., Inc. v. United States,* 42 Fed.Cl. 867 (1999) (Judgment) (*Associated II*); *Associated Elec. Coop., Inc. v.* *United States,* 42 Fed.Cl. 867 (1999) (Opinion) (*Associated I*).

## BACKGROUND

Associated is a rural electric cooperative that generates electricity through the operation of five coal-fired steam electric generation plants, two of which are located in New Madrid, Missouri, and three of which are located near Thomas Hill, Missouri. The Prairie Hill mine supplied coal to the three plants at Thomas Hill, and employed approximately 440 workers, 375 of whom were represented by the United Mine Workers of America (UMWA). The union employees were covered by the terms of the collective bargaining agreement executed between the UMWA and the Bituminous Coal Operators Association, the 1988 Bituminous Coal Wage Agreement (1988 National Agreement).

In 1990, Congress enacted the Clean Air Act Amendments (the Clean Air Amendments), Pub.L. No. 101–549, 104 Stat. 2399, which imposed limitations on the amount of sulfur dioxide emissions by utilities. The emissions reductions mandated by the Clean Air Amendments were scheduled to occur in two parts, Phase I commencing January 1, 1995, and Phase II commencing January 1, 2000. In order to comply with the Clean Air Amendments, Associated ultimately decided to stop using local high-sulfur coal (local coal) and switch to low-sulfur coal shipped from western states (western coal). The switch, however, necessitated the closure of Associated's Prairie Hill mine and a lay-off of its workers. The UMWA favored the installation of scrubbers, pollution control devices that collect sulfur dioxide emissions before they pass into the air. Installation of scrubbers would preserve mine operations and prevent layoffs.

After holding a series of public meetings to discuss the options for complying with the Clean Air Amendments, Associated's Board of Directors (Board) adopted a resolution on May 28, 1992, that contained a compromise plan that called for Associated to burn a mixture of western and local coal until January 1, 1998. Under the plan, Associated would continue mining operations at the Prairie Hill mine until 1995, at which time the mining operation would be downsized. In 1995, Associated would switch to western coal in two of the Thomas Hill plants, but burn a mixture of local and western coal in the third plant. Associated would continue to downsize mining operations until the end of 1997, at which time it would reevaluate whether to continue the mining operations at the Prairie Hill mine.

Shortly thereafter, Associated and the UMWA began negotiations concerning severance benefits for those employees subject to the reduction in workforce that would commence at the end of 1994.

Concurrently with the UMWA negotiations, Associated discovered that the economic benefits associated with the conversion to western coal far exceeded the initial amount anticipated by the Board. As a result, the Board reevaluated the compromise plan outlined in its earlier resolution. After considering the options for the Prairie Hill mine, the Board authorized Associated to offer an "early out" plan, or voluntary separation package, to the employees of the Prairie Hill mine to accomplish the switch to western coal sooner than originally anticipated.

In November 1992, after extensive negotiations, Associated and the UMWA executed two agreements, the "1992 Interim Agreement Between Associated Electric Cooperative, Inc. and the International Union, United Mine Workers of America" (Interim Agreement), and the "Income Security Agreement Between United Mine Workers and Associated Electric Cooperative, Inc." (ISA).

The ISA included both the early out plan and an involuntary severance plan. Under the involuntary severance plan employees involuntarily laid off were entitled to a one time severance payment equal to one month's earnings for each full year of employment with Associated. The early out plan entitled eligible employees to the same payment as those employees who were involuntarily laid off, but it also included a supplemental payment equal to

twelve months' earnings. Participants in both plans received extended health and other insurance coverage at the levels specified in the 1988 National Agreement or any successor national agreement upon the former's expiration. Moreover, under both plans participants received educational benefits, reemployment assistance, and preferential hiring at other Associated locations. If hired at another Associated location, the participant also received reimbursement for relocation expenses (meals, lodging, storage, moving, travel). Finally, Associated eased some of its hiring practices to facilitate participants' hiring for internal vacancies at Associated by relaxing its nepotism rules, and waiving background checks and medical examinations.

In exchange for these benefits, the UMWA agreed that it would not "instigate, support, condone or ratify any illegal UMWA work stoppage or strike related to the Cooperative's decision to switch fuels during the duration of this Agreement."

The Interim Agreement provided that both Associated and the UMWA would be bound by and comply with the terms of the 1988 National Agreement after its expiration until a successor agreement was executed. In addition, the UMWA relinquished its right to strike against Associated upon the expiration of the 1988 National Agreement in return for certain retroactive payments.

The early out plan proved successful, drawing 340 participants, 268 employees represented by the UMWA, and 72 non-union member employees. Mining operations at the Prairie Hill mine ceased on February 2, 1993. Those employees who did not participate in the early out plan continued their employment with Associated and completed the required reclamation of the mined land in 1998. The employees laid off after the reclamation process received benefits under the involuntary severance plan.

In February 1993, Associated paid FICA taxes totaling $2,835,111.86 for the tax period January 1 to March 31, 1993 with respect to the payments made to its employees under the early out plan.[2] Following the filing of its quarterly tax return in April, 1993, Associated requested a refund from the IRS of the taxes paid in February, 1993. The IRS denied the request in 1995. Associated brought its complaint in the Court of Federal Claims seeking a refund of the FICA taxes paid.

The Court of Federal Claims entered judgment in favor of the government. The court relied upon the Supreme Court's construction of "wages" and "employment" in *Social Security Board v. Nierotko*, 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718 (1946), recognizing that "[t]he notion of an 'employer-employee relationship' continues to be ... the touchstone for determining if a particular payment is subject to FICA taxation." *Associated I*, 42 Fed.Cl. at 872. The court further determined that "[s]ervices performed need not be linked to a particular or productive activity to fall within FICA tax liability." *Id.* at 874. The court rejected Associated's argument that its payments made to induce employees to voluntarily resign were not made for services rendered and therefore not subject to FICA taxes.

The court concluded that the payments arose out of the employer-employee relationship, noting that the payments were computed based on years of service and rate of pay. The court also noted that Associated had rejected a union proposal that years of service be based on service to the mine, because such a proposal would mean compensating employees for service with other employers. Finally, the court noted that the payments constituted income to the employees for federal income tax purposes, and did not fall within any of the statutory exceptions from wages.

With respect to the UMWA's agreement not to strike, the court rejected the argument that the payments were made solely in exchange for the release of the right to

---

2. Only the taxes paid with respect to the early out plan are at issue. Associated does not challenge the taxable nature of the payments made under the involuntary severance plan.

strike. The court concluded that the early out plan was not created for the limited purpose of obtaining the promise not to strike when the 1988 National Agreement expired. The court also noted that because the payments were made to non-union employees in addition to union employees, Associated offered the early out plan for economic reasons.

## DISCUSSION

■ We review issues of statutory interpretation de novo, *see INS v. Cardoza-Fonseca*, 480 U.S. 421, 446, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *Doyon, Ltd. v. United States*, 214 F.3d 1309, 1314 (Fed. Cir.2000), and findings of fact for clear error, *see Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1432 (Fed.Cir.1998). The objective when interpreting statutes is to give effect to the intent of Congress. *See NLRB v. Lion Oil Co.*, 352 U.S. 282, 297, 77 S.Ct. 330, 1 L.Ed.2d 331 (1957); *In re Portola Packaging, Inc.*, 110 F.3d 786, 788 (Fed.Cir.1997). To determine Congressional intent, we begin, of course, with the language of the statutes at issue. *See Toibb v. Radloff*, 501 U.S. 157, 162, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991). However, to fully understand the meaning of the statute, we look "not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." *Crandon v. United States*, 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990).

The statutory framework upon which this case is based involves the payment of FICA taxes by the employer to the government on behalf of both the employer and the employee. Internal Revenue Code (IRC) § 3111 imposes a FICA tax on employers with respect to the wages paid to its employees. Concurrently, IRC § 3101 requires employers to withhold FICA taxes from the wages of its employees on behalf of the employee. IRC § 3121(a) defines "wages" for purposes of the FICA tax as "all remuneration for employment," with certain exceptions not applicable in this case. The term "employment," defined in § 3121(b), is "any service, of whatever nature, performed (A) by an employee for the person employing him...." The language of § 3121 provides only a general guide for the scope of the terms "wages" and "employment." We must, then, consider the object and policy of the statute.

■ "The purpose of the ... Social Security Act is to provide funds through contributions by employer and employee for the decent support of elderly workmen who have ceased to labor." *Nierotko*, 327 U.S. at 364, 66 S.Ct. 637 (citing *Helvering v. Davis*, 301 U.S. 619, 641, 57 S.Ct. 904, 81 L.Ed. 1307 (1937)). In enacting the FICA tax provisions, Congress intended to impose FICA taxes on a broad range of employer-furnished remuneration in order to accomplish the remedial purpose of the Social Security Act. See H.R.Rep. No. 615, 74th Cong., 1st Sess. 3 (1935), reprinted in 1939–2 C.B. 600, 601 (describing aims of Social Security Act). This court's predecessor, in construing § 3121, has interpreted "wages" and "employment" to cover a back pay award and ruled that it constituted "wages" for FICA tax purposes. *See Ainsworth v. United States*, 185 Ct.Cl. 110, 399 F.2d 176, 185–86 (1968) (citing *Nierotko*, 327 U.S. at 364–65, 66 S.Ct. 637). Moreover, other courts construing § 3121 have interpreted the terms "wages" and "employment" broadly. *See, e.g., Mayberry v. United States*, 151 F.3d 855, 860 (8th Cir.1998) (stating that the definitions of "wages" and "employment" for purposes of FICA "are worded so as to 'import breadth of coverage'") (quoting *Nierotko*, 327 U.S. at 365, 66 S.Ct. 637); *Hemelt v. United States*, 122 F.3d 204, 209 (4th Cir. 1997); *Lane Processing Trust v. United States*, 25 F.3d 662, 665 (8th Cir.1994) ("courts are to construe [the definition of wages and employment] broadly to effect FICA's ... remedial purposes"); *Gerbec v. United States*, 164 F.3d 1015, 1026 (6th Cir.1999) (" 'remuneration for employment' includes certain compensation in the employer-employee relationship for which no actual services were performed"). *But see*

*Dotson v. United States*, 87 F.3d 682, 689–90 (5th Cir.1996) ("The [payment] compensated for the 'loss in earning capacity,' not for services already performed, and is thus not subject to wage taxation."). We conclude, therefore, that "wages" and "employment" are to be construed broadly in order to fulfill the intent of the legislation.

Associated argues that the statute mandates that services must be performed in order for the remuneration to be classified as "wages." Associated contends that the Court of Federal Claims' broad interpretation of *Nierotko* reads out of § 3121(b) the requirement that services must be rendered for a payment made in an employment relationship to be "wages."[3] We cannot agree.

In *Nierotko*, a majority of the Supreme Court held that back pay awarded under the National Labor Relations Act to an employee who had been wrongfully discharged constituted "wages" under the Social Security Act. In rejecting the taxpayer's argument that the back pay award did not constitute wages since it did not relate to actual services performed, the Court emphasized the broad definition of "employment" for FICA purposes, stressing the import of the employee-employer relationship:

> The very words "any service … performed … for his employer," with the purpose of the Social Security Act in mind, import breadth of coverage. They admonish us against holding that "service" can be only productive activity. We think "service" as used by Congress in this definitive phrase means not only work actually done but the entire employer-employee relationship for which compensation is paid to the employee by the employer.

*Id.* at 365–66, 66 S.Ct. 637 (footnote omitted).

■ The testimony of Mr. James Jura, General Manager and Chief Executive Officer of Associated, supports the conclusion that the payments were intimately related to and arose from the employer-employee relationship, and thus were "wages." Mr. Jura testified that the early out plan "was the right thing to do … [t]hese people had worked hard, and were good people…." In addition, Mr. O.B. Clark, President of Associated's Board of Directors, testifying with regard to the method by which early out payments were calculated, stated "[w]hy would a brand new hire get the same amount [as] the worker who had been working faithfully[?]" Payments for hard work and faithful service arise directly from the employee-employer relationship and are payments which recognize the value or character of the services performed for the employer. *See generally Lane*, 25 F.3d at 665–66 (citing *Marquette Univ. v. United States*, 645 F.Supp. 1007, 1013–14 (E.D.Wis.1986) (concluding that bonuses, the sizes of which were tied to the job performance and rank of the recipient, were "wages" subject to FICA)).

Further support for the characterization of the early out payments as "wages" is found in the ISA. Both the early out plan and the severance plan were options under the section of the ISA entitled "Income Replacement." Associated recognized that it was attempting to induce employees to resign in an economic climate where other employment was not readily available. The payments were designed to replace wages until the employee found other employment, with Associated or otherwise. *See, e.g., Gerbec*, 164 F.3d at 1026 (stating that award representing future wages reflects compensation paid to the employee because of the employee-employer relationship). Indeed, an employee who participated in the early out plan was not eligible for rehire while they were receiving payments under the plan. If the employee was rehired, payments ceased.

---

**3.** Associated contends that several revenue rulings support this argument. The Court of Federal Claims considered these rulings and determined that they did not support Associated's argument for a narrow definition of "wages." We agree.

■ Associated also contends that the payment computation method, based on length of service and rate of pay, is not dispositive that the payments were "wages." Associated asserts that this method was used because it was "fair" to the employees and would better induce acceptance of the program. We agree that the method by which the early out payments were calculated is not dispositive. The method is, however, a relevant factor in determining whether the payments constitute "wages." *See Mayberry,* 151 F.3d at 860 ("class members' employment 'relationship for which compensation is paid' was factored into the ... award; the calculation of the ... award ... involved the former employees' length of service ... and their expected and pre-layoff earnings...."); *Hemelt,* 122 F.3d at 210 ("The method used to calculate the awards ... supports [characterizing the payments] as wages.... [K]ey factors ... were the length of each employee's tenure ... and the salary he received...."); *Lane,* 25 F.3d at 665 (stating that payments were "remuneration for employment" because they were "based on factors traditionally used to determine employee compensation, specifically, the value of the services performed ..., the length of ... employment, and ... prior wages.") The method of computation supports characterization of the early out payments as "wages" and becomes especially relevant in light of Associated's desire to only compensate the employees for service to Associated and not to the mine, which would have allowed compensation for service to other employers.

■ Finally, Associated argues that the payments made to union employees were made in exchange for valuable rights, *i.e.,* the union's promise not to strike, and thus were not for services performed. The government contends that the union's agreement not to strike was given in exchange for all the benefits in the ISA, including the involuntary severance payments that admittedly were subject to FICA taxes. The government also asserts that both union and non-union employees were offered the programs, and therefore, Associated's motivations for offering the early out plan were not solely to avoid labor unrest. We agree.

The Clean Air Amendments required Associated to limit its sulfur dioxide emissions within a certain time period. Although securing the UMWA's agreement not to strike was a critical concession for Associated, it was not the sole motivation for Associated to offer the early out plan. Associated was motivated to offer the early out plan first and foremost on the basis of economic benefits. Mr. Jura and Mr. Clark testified that Associated developed and offered the early out plan after it realized that substantial savings could be realized by switching to western coal sooner rather than later. Furthermore, Mr. Jura testified that the initial negotiations with the UMWA concerning the switch in coal supplies centered around the compromise plan's schedule of closings and layoffs, and included an involuntary severance plan. The agreement not to strike was a part of these negotiations. Concurrently, Associated and the UMWA were negotiating the Interim Agreement. The early out plan was not part of the initial negotiations, and the Interim Agreement was already under negotiation before the early out plan was offered. Thus, the elimination of labor unrest continued to be a concern both before and after the inclusion of the early out plan. Further, the right to strike was given up for all the benefits in the ISA, which included, *inter alia,* the early out plan, the involuntary severance agreement, and health and other insurance benefits. Finally, the early out plan was related in part to the employees' prior service to Associated. *See Lane,* 25 F.3d at 665–66 (stating that the payments each employee received were a function of the employee's length of service, value of service rendered, and prior wages, and that the distributions were linked to factors traditionally used to determine employee compensation, and were not just "determined by general considerations of fairness.").

The early out payments arose out of the employment relationship between Associated and its employees. Consequently, the payments fit within the statutory definition of "wages."

## CONCLUSION

Under the circumstances of this case and the broad definitions of "wages" and "employment enunciated" in *Nierotko*, we conclude that the Court of Federal Claims did not err in holding that payments made by Associated under the early out plan were "wages" as contemplated by § 3121 and therefore subject to FICA tax.

## COSTS

Parties shall bear their own costs.

*AFFIRMED.*