SAN FRANCISCO BASEBALL ASSOCIATES L.P., A/K/A San Francisco Giants, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. C–99–0968 SC.

United States District Court, N.D. California.

March 3, 2000.

Mark Reagan, Iona Petrou, James Huston, Elizabeth Idleman, Foley & Lardner, San Francisco, CA, for plaintiff.

U.S. Attorney's Office, Jay R. Weill, Assistant U.S. Attorney, San Francisco, CA, for defendant.

*ORDER RE MOTIONS FOR
SUMMARY JUDGMENT*

CONTI, District Judge.

## I. *INTRODUCTION*

In the above-captioned case, Plaintiff San Francisco Baseball Associates L.P. (the "Giants") brings an action against De-

fendant United States of America (the "Government") for the refund of employment taxes paid by the Giants in the 1995 calendar year. The dispute arises out of payments made to seven former Giants baseball players from a $280 million settlement of three grievances filed by the Major League Baseball Players' Association (the "Players' Association") against 26 Major League Baseball Clubs (the "Clubs") for the violation of a collective bargaining agreement. The Giants contend that these payments are damages rather than wages, and thus are not subject to taxation pursuant to the Federal Insurance Contribution Act ("FICA") and the Federal Unemployment Tax Act ("FUTA"). The Giants also contend that, even if the payments are wages, they should be allocated to the 1986 and 1987 calendar years to which the payments relate rather than to the 1995 calendar year during which the payments were actually made. Now before the Court are both parties' motions for summary judgment.

## II. *BACKGROUND*

The Giants, along with 25 other Clubs, entered into a collective bargaining agreement with the Players' Association called the Basic Agreement, which became effective on January 1, 1980. The Basic Agreement deals with the terms and conditions of the players' employment with the Clubs, such as minimum salaries, benefits, and discipline. In addition, each player uses the Uniform Player's Contract ("UPC"), attached to the Basic Agreement as Schedule A, as the basis of his individually negotiated employment contract.

In 1986, 1987, and 1988, the Players' Association filed three separate grievances against the Clubs, charging that the Clubs had violated the Basic Agreement by acting in concert to interfere with the rights of "free agents" to bargain freely with the Clubs. In each case, the Major League Arbitration Panel [1] (the "Panel") held that

---

1. The Basic Agreement provides that disputes between the parties be resolved through arbi-    tration.

the Clubs had violated Article XVIII(H) of the Basic Agreement, which prohibits collusion in the market for free agents. Specifically, the Panel found that following the 1985 and 1986 seasons, the Clubs had agreed not to bid for free agents whose present Club wanted to retain their services, and that following the 1987 season, the Clubs shared information regarding bids in order to restrain the market for players.

In subsequent proceedings, the Panel determined that the aggregate salary shortfall, which measures the additional compensation the players would have received if the Clubs had not colluded, was $10,528,086.71 for 1986, $38,000,000 for 1987, and $64,500,000 for 1988. In an informal draft decision, the Panel substantially agreed with the Clubs that the players could not recover for any alleged non-salary related injuries. After the Players' Association objected to the draft decision, the Panel agreed to further consider the matter, but no final decision ever issued.

The parties settled before the Panel considered the salary shortfalls for the years subsequent to 1988, and before the Panel released a final decision relating to the players' non-salary related claims. Under the Settlement Agreement, dated December 21, 1990, the Clubs agreed to pay a total of $280 million to the players, constituting $243,202,104 in settlement of all claims and $36,797,896 in pre-settlement interest. The Settlement Agreement did not allocate the settlement funds to any of the specific claims or years beyond the separation of damages and interest. Instead, it allowed the Players' Association to determine how to allocate the settlement fund among the players, but required all proposed distributions to be approved by the Panel.

Each Club agreed to pay 1/26th of the total settlement amount. The Settlement Agreement provided that until the entire settlement fund was distributed, each Club's share of the settlement fund would be tracked by a separate "Club Subaccount," initially increased by the Club's payments into the overall Settlement Account and then reduced by a proportionate share of any distribution to the players. The Settlement Agreement also provided that each Club's creditors could attach its subaccount but not that of any other Club, and that each Club would be responsible for the payment of taxes on investment earnings attributed to its subaccount.

The Players' Association advanced a Proposed Framework for the Evaluation of Individual Claims (the "Framework"), which was substantially approved by the Panel on September 11, 1991. The Framework permits players to submit a variety of claims, including, *inter alia*, what it calls "salary related" claims for lost salary, lost bonuses, and lost multi-year contracts as well as what it calls "non-salary related" claims for lost jobs, loss of mobility, and loss of security. While the Framework does not allocate any specific dollar amount for the non-salary related injury claims (other than for lost jobs), it does note that the Players' Association's best judgment was that there was "only a very minimal chance of prevailing" on such claims, and that the Players' Association "does not believe there will be many potentially valid claims of this type."

The Players' Association proposed three distribution plans relating to the salary shortfall claims submitted by the players for the years 1986 and 1987. The Panel substantially approved these plans, which resulted in the distribution of $45,970,701 to the players. The Players' "non-salary related" claims were dealt with in Partial Distribution Plan IV (the "Distribution Plan"), proposed by the Players' Association on January 7, 1994 and approved by the Panel on January 10, 1995. The Distribution Plan covered the players' claims submitted for the years 1986 and 1987 relating to lost jobs, loss of mobility, emotional distress, other non-salary related damages, and lost major league service. The Distribution Plan recommended a total payment of $7,208,355, including $1,890,000 for loss of mobility claims.[2]

2. In particular, the Distribution Plan recom-

mended a payment of $4,787,146 for the lost

The payments arising out of these loss of mobility claims are the subject of the present action. Players submitted loss of mobility claims to receive compensation for their inability to work in the city of their choice or for the manager they preferred. The Panel approved the Players' Association's proposal to pay all those receiving loss of mobility payments a flat $10,000 award.[3]

Pursuant to the Distribution Plan, seven former Giants baseball players were paid a total of $90,000, excluding interest, in compensation for their loss of mobility. Specifically, three players received $10,000 each for 1986, and six received $10,000 each for 1987. The Giants paid $6,885 in FICA taxes and $336 in FUTA taxes on these payments in 1995. The Giants then filed a claim for a refund with the Internal Revenue Service ("IRS"), which the IRS denied on March 5, 1997. The present action for a refund of the employment taxes followed.

Both parties now move for summary judgment.

## III.  *LEGAL STANDARD*

Summary judgment is proper only when there is no genuine issue of material fact and, when viewing the evidence in the light most favorable to the nonmoving party, the movant is clearly entitled to prevail as a matter of law. *See* Fed.R.Civ.P. 56(c); *Cleary v. News Corp.,* 30 F.3d 1255, 1259 (9th Cir.1994). Once a summary judgment motion is made and properly supported, the nonmoving party may not rest on the mere allegations of its pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *See* Fed R. Civ. P. 56(e); *Celotex Corp. v. Myrtle Nell Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986). In addition, to withstand a proper motion for summary judgment, the nonmoving party must show that there are "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

If the factual context makes the nonmoving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Moreover, if the nonmoving party has the burden of proof on a given issue, the moving party can prevail by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548.

## IV.  *DISCUSSION*

The parties agree that there are no genuine disputes of material fact. (Counter–Mot. Summ. J. at 1) Both have moved for summary judgment based on undisputed facts. Therefore, the Court must determine, as a matter of law, whether the payments made to the seven Giants players are properly subject to taxation under FICA and FUTA, and if so, whether such taxes should be allocated to 1986 and 1987 or to 1995.

### A.  *Taxability of Payments Under FICA and FUTA*

FICA imposes an employment tax on both employers and employees. The first

---

jobs claims and $2,421,209 for the remaining non-salary related claims, including those pertaining to loss of mobility. Since the Framework allocated $47,597,630 for all 1986 and 1987 damage claims (except those for lost jobs), the first three distributions had left only $1,626,929 to satisfy the non-salary related and non-lost jobs claims for 1986 and

1987. Because the proposed $2,421,209 distribution exceeded this amount, the Panel ordered that the excess be paid out of a $15 million contingency fund established by the Framework.

**3.**  The only exception was for three players who worked in Japan, who were given flat $20,000 payments.

tax is imposed on employers based on "wages paid ... with respect to employment." 26 U.S.C. § 3111. The second tax is imposed on employees based on "wages received ... with respect to employment." 26 U.S.C. § 3101. FUTA imposes an employment tax on employers only based on "total wages paid ... with respect to employment." 26 U.S.C. § 3301.

Both FICA and FUTA broadly define "wages" as "all remuneration for employment" unless specifically excepted. 26 U.S.C. §§ 3121(a), 3306(b). "Employment" in this context means "any service of whatever nature performed by an employee for the person employing him...." 26 U.S.C. §§ 3121(b), 3306(c). The Supreme Court has noted that these definitions are worded so as to "import breadth of coverage" and apply "not only to work actually done but the entire employer-employee relationship for which compensation is paid to the employee by the employer." *Social Security Board v. Nierotko,* 327 U.S. 358, 365—66, 66 S.Ct. 637, 90 L.Ed. 718 (1946).

The Giants argue that the payments to seven of their former players are not wages for two reasons. First, the Giants argue that the payments were not paid by an employer to an employee. Second, they argue that the payments represent compensation for loss of mobility, and thus are not remuneration for services performed. The Court will discuss each in turn.

### 1. *Employer-employee relationship*

The Giants argue that the loss of mobility payments were made by the Players' Association from a fund to which the Giants contributed only 1/26th of the total amount. Thus, they argue, the payments were made not from the players' former employer, but mainly from Clubs that never actually employed them. The Giants cite *Newhouse v. McCormick,* 157 F.3d 582 (8th Cir.1998), for the proposition that payments to a non-employee are not wages.

The Giants position on this issue is at odds with the position they took in their Complaint, in which the Giants expressly stated that they agreed with the IRS's ruling that "the employer of the recipient Player for federal employment tax purposes was the Club with which the Player was under contract during the year (in this case, 1986 or 1987) to which the payments related." (Compl. at ¶ 22(c)) The Giants argue that they maintained in their Complaint that they did not agree that the payments were wages. While true, the reason for this position was their argument that the payments were not "remuneration for employment," not that the Giants were not an employer. (Compl. at ¶¶ 29–34)

An additional problem with the Giants' argument is that it would result in no one paying employment taxes on the entire distribution of the settlement fund. In similar situations, courts have deemed trust funds themselves to be "employers" for the purposes of employment tax liability. *See Sheet Metal Workers Local 141 Supplemental Trust Fund v. United States,* 64 F.3d 245, 249 n. 2 (6th Cir.1995) (finding that an unemployment trust fund established pursuant to a collective bargaining agreement and funded by employer contributions was an employer for the purposes of FICA and FUTA taxation when the fund liquidated and distributed its corpus and investment earnings to members of the union for which it had been established). Thus, Courts have broadly construed the boundaries of the employer-employee relationship to effect FICA and FUTA's remedial purposes. *See Lane Processing Trust v. United States,* 25 F.3d 662, 666 (8th Cir.1994). Here, neither the Players' Association nor the custodian of the Settlement Account has paid employment taxes on the distributions to the players. Indeed, the Clubs agreed to be responsible for such taxes if the distributions were determined to be wages. Thus, it is consistent with the remedial purposes of FICA and FUTA to define the employment relationship broadly and to hold the employers contributing to the Settlement Account responsible for these taxes. It is not disputed that absent

collusion, the players would have received higher salaries, and the Clubs employing them would have been responsible for payment of employment taxes on these higher salaries. Given that no other party is paying employment taxes on these funds, it is not unreasonable to hold the Clubs responsible for the taxes they would have paid if they had not colluded in the first place.

A third problem with the Giants' position is that the mechanical operation of the Settlement Account is such that a payment to a player is first drawn from the subaccount of the player's employer. Later, this subaccount is "reimbursed" from the other Clubs' subaccounts for 25/26th of the payments. (Supplemental Declaration of Jay Weill, Exh. A, at 24) Thus, in this case, the funds used to pay the seven players came first from the funds actually contributed by the Giants.

The Giants argue that the payments represent damages from the 25 other Clubs for their refusal to hire the players, and are thus outside the employment relationship between the Giants and their former players. However, collusion on the part of the Clubs resulted in an overall salary shortfall for all players, not just a one time drop in potential salary for those players who were denied the ability to shop their services. Thus, while some players would have earned higher salaries by moving to another Club, other players may very well have remained with their former Club at a higher salary level. Furthermore, the Panel found that the effect of the Clubs' collusion was to depress the salaries of all players with two or more years of service, not just those eligible for free agency status. The Panel wrote: "[T]he availability of salary arbitration to a substantial segment of the player population holding less than six years of Major League service, coupled with the prospect that such junior players would inexorably acquire eligibility for free agency, tended to drive upward all baseball salaries except for those of first year players." (Declaration of Jay Weill ("Weill Decl."), Exh. 5, at 4) Thus, the settlement fund represents in large part money that the Giants would actually have paid to their former players. Moreover, there is a nexus between the Giants and the loss of mobility payments themselves because the actual decision to deny mobility to any given player was made first by that player's current employer, who was then able by agreement with the other Clubs to prevent any other Club from hiring that player.

The Giants argue that the settlement fund represents damages resulting from breach of the Basic Agreement rather than any individual player's employment contract. However, each player was obligated to use the UPC attached to the Basic Agreement as Schedule A. Each UPC incorporates several provisions of the Basic Agreement, and most significantly relies on the free agency rights guaranteed by the Basic Agreement that were the subject of the dispute between the Players' Association and the Clubs. (Weill Decl., Exh. 1, at ¶ 10) Thus, the players' individually negotiated UPCs relied on the Basic Agreement.

■ For the foregoing reasons, the Court finds that there was an employer-employee relationship between the Giants and the seven former players who received loss of mobility payments.

### 2. *Remuneration for services*

The Giants' second argument is that the payments represent compensation for loss of mobility, and are thus not remuneration for services performed. The Government contends that, regardless of what the Players' Association has called the payments, because the Players' claims were principally salary related, payments from settlement of those claims should be considered wages for employment tax purposes. The Court agrees.

■ In general, the tax consequences of payments made pursuant to a settlement agreement are determined by the nature of the underlying claim. *See Getty v. Commissioner of Internal Revenue,* 913

F.2d 1486, 1490 (9th Cir.1990). The parties own allocation of the payments, in the settlement agreement or at any time after the adversarial nature of the litigation has ceased, is not determinative. *See Robinson v. Commissioner of Internal Revenue*, 70 F.3d 34, 37—38 (5th Cir.1995) (upholding tax court's rejection of parties' allocation in the settlement agreement of 95 percent of the settlement proceeds to mental anguish so as to minimize tax liability and basing allocation instead on jury's actual award made before the parties settled). To determine how to allocate portions of a settlement agreement for tax purposes, courts look to the best objective evidence available under the facts and circumstances of the case. *See* Rev. Rul. 85–98 (basing allocation on the complaint). However, Courts will not allocate unless there is clear factual evidence on which to do so. *See Abrahamsen v. United States*, 44 Fed. Cl. 260, 271 (1999).

In the case at hand, the Settlement Agreement did not allocate payments with regard to claims except to separate damages from interest. The Court does not consider the Players' Association's later characterization of the payments, either in the Framework or in the Distribution Plan, to be determinative for tax purposes. The Players' Association could, for example, characterize an unreasonably large percentage of the settlement funds as non-wage claims in order to minimize the tax liability of the players and the Clubs.

The only pre-settlement factual evidence submitted by the parties on which to base an allocation is the risk analysis prepared by the Clubs' lawyers to aid the Clubs in their settlement deliberations. (Weill Decl., Exh. 12) The analysis starts with the $113,900,000 that the Panel had already awarded as the salary shortfall for the years 1986, 1987, and 1988. The analysis then outlines the payments the lawyers expected would result from continued litigation of the remaining claims. The lawyers used several different analyses to predict a total salary shortfall for the years 1986 to 1990 of from $267.4 million to $296.3 million. The lawyers also predicted

total payments of $71.2 million for "other claims," including spillover salary effects through 1992, attorneys fees, loss of endorsements, and $7.8 million for loss of mobility. Averaging four different analyses and adjusting for the probability of a reversal or appeal with a significant reduction in damages, the lawyers predicted an overall risk of loss on all the grievance claims of $300.3 million. The Clubs eventually settled the claims for $280 million.

It is difficult to deduce from the risk analysis whether the players actually had a valid claim for damages for non-salary related injuries. The Giants contend that, because the risk analysis presented to the Clubs included loss of mobility claims as a potential liability, the Clubs would have taken this claim into account when settling all the claims. The Government counters that the total settlement is about equal to the average of the payments predicted for the salary shortfall claims for 1986 to 1990 alone. In addition, the Government points out that the Panel had substantially rejected the Players' Association's non-salary related claims, even though it had not yet issued a final decision on the matter. Furthermore, even the Players' Association itself admitted in the Framework that it believed that there was "only a very minimal chance of prevailing" on such claims, and that it "does not believe there will be many potentially valid claims of this type." (Weill Decl., Exh. 8, at 12)

Thus, the Court finds that the risk analysis does not constitute clear factual evidence on which it can justify an allocation. In addition, the Court is reluctant to allocate when all the funds have been commingled, and when the vast majority of the settlement funds relate to the claims involving the salary shortfall resulting from the Clubs' collusion.

■ Viewing the loss of mobility payments in the context of the overall distributions made to the players, the Court finds that they are wages. Back-pay awards, which aim to compensate employees for wages that should have been paid,

indisputably constitute remuneration for employment. *See Nierotko,* 327 U.S. at 364–65, 66 S.Ct. 637. Thus, the payments at issue in this case, which were made from commingled funds mainly representing the wages the players would have earned if not for the Clubs' collusion, should be treated as wages for the purposes of FICA and FUTA taxation.

Furthermore, the loss of mobility payments would constitute wages under *Hemelt v. United States,* 122 F.3d 204, 209–210 (4th Cir.1997), and *Mayberry v. United States,* 151 F.3d 855, 860 (8th Cir.1998), which held that even though some payments may have been intended to compensate the plaintiffs for nonpecuniary losses, such payments are wages when they come from an overall settlement fund distributed to former employees based directly on their employment relationship.[4] The Court finds that the loss of mobility payments made to the Giants' former players from commingled funds are similarly related to the employment relationship, and thus are wages under FICA and FUTA.

For the foregoing reasons, the Court holds that the loss of mobility payments constitute wages and are subject to employment taxes. Thus, as to the taxability of the payments, the Court must grant the Government's motion for summary judgment and deny the Giants' motion for summary judgment.

## B. *Allocation of Payments*

In *Nierotko,* the Supreme Court held that a back-pay award should be allocated for the purposes of determining social security benefits to "the year in which the money would have been earned." 327 U.S. at 370, 66 S.Ct. 637. The Court concluded that if "back-pay is to be treated as wages, we have no doubt that it should be allocat-

ed to the periods when the regular wages were not paid as usual." *Id.* at 644, 66 S.Ct. 637. The Seventh Circuit Court of Appeals, in *Bowman v. United States,* 824 F.2d 528 (6th Cir.1987), extended this ruling from the allocation of back-pay awards for the purposes of benefits to the allocation of back-pay awards for the purposes of taxation.

The plaintiff in *Bowman* received back-pay as part of the settlement of a race discrimination suit he brought against his employer. He received the back-pay in 1981, but argued that because the payments represented wages he should have been paid in earlier years for which he had already paid the maximum FICA taxes, he did not owe employment taxes on the back-pay. The Court agreed, holding that: "[a] settlement for back wages should not be allocated to the period when the employer finally pays but should be allocated to the period when the regular wages were not paid as usual." *Id.* at 530 (citing *Nierotko,* 327 U.S. at 370, 66 S.Ct. 637). *See also Johnston v. Harris County Flood Control Dist.,* 869 F.2d 1565, 1580 (5th Cir.1989) ("At least for purposes of FICA (Social Security) taxes, a plaintiff receiving a back-pay award is liable for the taxes that would have accrued in the year the wages were due.") (citing *Bowman,* 824 F.2d at 530). One District Court has applied the holding in *Bowman* to payments arising from the exact same settlement as in the instant case, allocating FICA and FUTA tax liability for payments received by the players in 1994 to the years 1986 and 1987 to which they related. *See Cleveland Indians Baseball Co. v. United States,* 1999 WL 72866 (N.D.Ohio 1999).

■ This Court finds the reasoning of the *Bowman* Court persuasive. In particu-

---

**4.** *Hemelt* and *Mayberry* involved the distribution of a settlement award in an ERISA class action brought by former employees of the Continental Can Company ("Continental") who alleged that Continental had fired them in order to avoid incurring liability for their pensions. Class members received a Basic Award to compensate them for nonpecuniary

losses such as mental anguish and dignitary harm, and an Earnings Impairment Additure to compensate them for lost earnings capacity. Both the *Hemelt* and *Mayberry* Courts, noting that "wages" are to be broadly interpreted, held that the entire award constituted wages under FICA. *See Hemelt,* 122 F.3d at 209—210; *Mayberry,* 151 F.3d at 860.

lar, this Court agrees that the clarity, symmetry, and fairness of the Social Security system is advanced by using the same allocation principle for both benefits and taxation. *See Bowman,* 824 F.2d at 530. In addition, because FICA and FUTA taxes are subject to a yearly ceiling, failure to allocate the taxes in the instant case would subject the Giants to double taxation because they have already paid employment taxes on wages paid in the years to which the payments relate.

The Government argues that, according to the plain language of the statutes imposing FICA and FUTA taxation on amounts "paid" by employers and "received" by employees, taxes are due in the year the wages are actually paid rather than in the year they should have been paid. However, the Court finds that the statutes do not unambiguously apply to the case of back-pay awards. In particular, the Giants have produced evidence showing that when Congress amended the relevant portions of the statutes, it was concerned with the treatment of year-end pay rather than back-pay. (Counter–Mot. Summ. J. at 16)

The loss of mobility payments relate to 1986 and 1987, when the Clubs agreed not to bid for the seven players whose services the Giants wished to retain. Thus, the Court holds that the loss of mobility payments should be allocated for tax purposes to the years 1986 and 1987, and not to 1995. Therefore, as to the allocation of the payments, the Court must grant the Giants' motion for summary judgment and deny the Government's motion for summary judgment.

## V. CONCLUSION

For the foregoing reasons, this Court ORDERS that:

(1) Defendant United States of America's Motion for Summary Judgment is GRANTED in part as to the taxability of the loss of mobility payments and DENIED in part as to the allocation of these payments;

(2) Plaintiff San Francisco Baseball Associates L.P.'s Counter–Motion for Summary Judgment is DENIED in part as to the taxability of the loss of mobility payments and GRANTED in part as to the allocation of these payments; and

(3) The United States of America shall refund to San Francisco Baseball Associates L.P. $5,426.40 in FICA and FUTA taxes, plus interest.

IT IS SO ORDERED.