185 F.Supp.2d 1043 (2001)
ST. LOUIS CARDINALS, L.P., a Missouri limited partnership f/k/a St. Louis Cardinals, Plaintiff
v.
UNITED STATES of America, Defendant.
No. 4:00-CV-138 CAS.
United States District Court, E.D. Missouri, Eastern Division.
May 11, 2001.
*1044 Mark D. Sophir, Matthew S. Shorey, Armstrong, Teasdale, LLP, St. Louis, MO, James L. Huston, Foley and Lardner, Milwaukee, WI, for plaintiff.
Henry J. Fredericks, Asst. U.S. Attorney, Office of U.S. Attorney, St. Louis, MO, Rachel D. Cramer, Charles P. Hurley, U.S. Dept. of Justice, Office of Special Litigation, Tax Div., Washington, DC, for defendant.

MEMORANDUM AND ORDER
SHAW, District Judge.
In 1990 the Major League Baseball clubs ("clubs") settled long-standing grievances with the Major League Baseball Players' Association ("Players' Association") over the clubs' collusion to interfere with the market for free agents. In settlement, the clubs collectively paid $280,000,000 into a fund that was distributed to individual players pursuant to a plan developed by the Players' Association, subject to the approval of the grievance arbitrator. Each club paid employment taxes on the payments made to its former players.
Plaintiff St. Louis Cardinals[1] filed this suit asserting that the payments made to players from the settlement fund were not wages for purposes of employment taxes. The matter is now before the Court on cross-motions for summary judgment. This Court concludes that the payments were made in connection with an employment relationship and were intended by the clubs to compensate their players for lost wages and thus fall within the definition of wages for employment tax purposes.

I. BACKGROUND
The relationship between the Players' Association and the Major League Baseball *1045 clubs (the clubs) was at all times material to the Complaint covered by a collective bargaining agreement effective January 1, 1980 ("the Basic Agreement").[2] The Basic Agreement sets the overall terms and conditions of players' employment that are collective in nature, including the establishment of minimum salaries and the provision of free agency rights to certain players.
Article XVIII of the Basic Agreement sets out the terms of free agency for major league players. Under the Basic Agreement, the term "free agents" refers to players in one of two situations. Re-entry free agents are players who have six years of service in the major leagues, and may elect to become free agents which in turn permits them to entertain employment offers from all of the other major league clubs. The second type of free agents are so-called tender free agents. A tender free agent is a player who is not otherwise eligible to be a free agent, but who is not offered a contract by his team. Such player is then free to entertain offers from other teams. Since a player who has become a free agent is free to deal with several clubs, they can hope that competition between the clubs will drive up the price of their labor.
Article XVIII(H) of the Basic Agreement prohibits concerted action by players or clubs in dealing with free agency. The article reads:
H. Individual Nature of Rights
The utilization or non-utilization of rights under this Article XVIII [relating to free agency] is an individual matter to be determined solely by each Player and each Club, for his or her own benefit. Players shall not act in concert with other players and Clubs shall not act in concert with other Clubs. (emphasis added)
In addition to the Basic Agreement, each individual player signs a Uniform Player Contract ("UPC") with his employing club. The standard form of the UPC was negotiated collectively between the clubs and the Players' Association. Depending on an individual player's success in bargaining, his UPC may include a salary greater than the minimum provided in the Basic Agreement, bonuses, deferred compensation and any other special covenants or conditions of employment negotiated between the player and the team.
The Basic Agreement requires that grievances be submitted to an arbitration panel for resolution and binding arbitration. The Players' Association submitted grievances to arbitration relating to the 1985, 1986 and 1987 seasons, asserting that the then 26 major league baseball clubs had violated Article XVIII(H) of the Basic Agreement by acting in concert with respect to the hiring of free agents. All three actions alleged that the players suffered damages from the violations of the Basic Agreement in these three years through at least 1990.
The arbitration panels concluded that the clubs had violated Article XVIII(H) of the Basic Agreement. Specifically, in all three actions, the arbitrators found that the clubs had, in fact, interfered with the contractual rights of the players before the 1986, 1987 and 1988 seasons by acting in concert (1) to preclude or hinder players who were free agents from leaving their previous clubs after the 1985 and 1986 baseball seasons, and (2) to depress overall salary levels and the levels of other contract benefits and special covenants after the 1987 baseball season by sharing information *1046 as to what offers were being made to free agent players.
The arbitration panel subsequently held that the players collectively suffered damages from loss of salary of $10,528,086.71 for 1986, $38,000,000 for 1987, and $64,500,000 for 1988. The arbitration panel did not attempt to determine the salary shortfalls experienced by any individual players.
The parties entered into a settlement agreement dated December 21, 1990, before the arbitration panel rendered its final decision as to salary claims for years other than 1986, 1987 and 1988, and before its decision as to the applicability of other claims for damages made by the Players' Association. The settlement required the clubs collectively to pay $280 million into an investment account or accounts. The $280 million, which included a principal amount of $243,202,104, was less than the predicted salary shortfall based on the clubs' risk analysis. A custodian was appointed to control the settlement fund. The agreement provides that the fund shall be distributed based on the decision of the Players' Association about how the fund is to be shared among the players. The distribution system is subject to the approval of the arbitrators but not the clubs themselves.
Each club contributed 1/26th of the total $280 million, or approximately $10.8 million. Under the terms of the settlement, the funds paid by each club remain the property of that club, subject to the attachment of creditors, until the entire fund is distributed.
The Settlement Agreement did not establish sums that would be paid to individual players. That authority resides with the Players' Association, subject to approval by the arbitration panel. The Players' Association began the distribution process by drafting a framework for distribution ("Framework"), which the arbitrators approved on September 11, 1991.
Pursuant to the Framework, the Players' Association proposed its first partial distribution plan providing for payments to individual players whose claims for damages related to the 1986 and 1987 seasons, which was approved by the arbitrators with modifications on February 14, 1994. The Players' Association proposed two more partial distribution plans, which were approved by the arbitrator with modifications on January 10, 1995 and May 1, 1997, respectively. As the Framework required, and as the parties had done in their overall Settlement Agreement, all three awards decisions distinguished damages awards from interest components. Interest was calculated at the U.S. government treasury bill rate, in accordance with the Settlement Agreement and Framework.
A few days after each of the award decisions, the custodian of the settlement account paid the awards to the designated players out of the Collusion Settlement Fund's checking account at the Morgan Guaranty Trust Company of New York. The custodian has 26 separate checkbooks for this same checking account. Each check form is entitled "Custodian of the Collusion Settlement Account as Agent for [name of team]." Thus, each player's award in 1994, 1995 and 1997 was paid simultaneously from the funds of all 26 settling clubs, with each club paying 1/26th of each player's award. Before each of the awards was paid, each club's subaccount contained exactly 1/26th of the settlement fund. Afterwards, each club's subaccount contained 1/26th of the remainder, no matter how much had been awarded to that club's former players.
Out of the March 1, 1994 distribution, six former players employed by the Civic Center Corporation (successor in interest to The St. Louis National Baseball Club, *1047 Inc.) in 1986 received individual monetary Settlement Payments comprising $1,369,093.00 in damages plus $492,958.75 in presettlement interest. Also on or about March 1, 1994, ten former players employed by (and two deemed employed by) the Civic Center Corporation in 1987 received individual monetary Settlement Payments comprising $1,659,464.00 in damages plus $465,699.12 in presettlement interest.
Because there is only one checking account for this Settlement Fund, the awards to Civic Center Corporation players were simultaneously and equally drawn from the commingled funds contributed by all 26 Major League Baseball clubs. Each of the 26 clubs' subaccounts was debited for 1/26th of the total awards to the Civic Center Corporation's former players.
Under the distribution scheme prepared by the Players' Association, the players were permitted to file non-salary claims, such as for loss of mobility, security, outside income and emotional distress. Distributions are made from the fund based on the arbitrator-approved Players' Association distribution plans. The fund administrator prepares checks for each individual player from one of 26 checkbooks, each which bears the name of a major league club, but which share one account number. Each check identifies the payor as "Custodian of the Collusion Settlement Account as Agent for [name of team]." The Custodian maintains a general ledger account on the books of the Major League Central Fund.
When a distribution is made from the fund, the Custodian arranges a wire transfer of sufficient funds to pay the employment taxes attributable to the distribution to the individual teams whose players are receiving the distributions. However, the teams themselves calculate the amount of the employment tax liability for each player. The fund itself does not pay employment taxes on any of the distribution amounts.
The first partial distribution awards were made on February 14, 1994. Additional distributions were made on January 26, 1995 and May 15, 1997.
On or about March 1, 1994, six players employed by the Cardinals[3] (SLNBC) in 1986 were paid individual monetary awards totaling $1,862,051.75 in damages of which $492,958.75 was interest.
On or about March 1, 1994, ten players employed by the Cardinals in 1987, and two players "deemed employed" were paid individual monetary awards totaling $2,125,163.12, of which $465,699.12 was interest. The players who were deemed to be employees received only $38,418.97 of the damage award.
On January 26, 1995, one player who was deemed employed by the Cardinals received a payment of $255,691.67, of which $67,691.67 was interest.
On or about January 26, 1995, three players employed by the Cardinals in 1987 were paid individual monetary awards of $38,418.96 in damages of which $8,418.96 was interest.
On about May 17, 1997, fourteen players employed by the Cardinals in 1988 were paid individual monetary awards totaling $3,450,178.19, of which $575,671.19 was interest.
Thus, a total of $7,687,090.73 was distributed to Cardinals players in the form of damages of which $7,392,980.09, 96%, was paid to players who were employees of *1048 the Cardinals in the year for which damages were paid.
In 1994 the Cardinals reported FICA and FUTA taxes attributable to the 1994 settlement distributions to its players in the amounts of $94,860.88 and $667.23, respectively. On February 21, 1996, the Cardinals filed a claim for a refund for itself and consenting players of $185,313.19 in FICA taxes and $662.23 in FUTA taxes. In 1995 the Cardinals reported FICA and FUTA taxes attributable to the 1994 settlement distributions to its players in the amounts of $10,354.41 and $160.00 respectively. On January 24, 1997, the Cardinals filed a claim for a refund for itself and consenting players of $10,345.41 in FICA taxes and $160.00 in FUTA taxes.
On February 27, 1998, the IRS issued a proposed partial disallowance of the claims for refund. The Cardinals appealed and the IRS has not taken any action on that appeal.
In 1997 the Cardinals reported FICA and FUTA taxes attributable to the 1997 settlement distributions to its players in the amounts of $83,610.36 and $600.00 respectively, On May 14, 1999, the Cardinals filed a claim for refund for itself and consenting players of $108,249.96 in FICA taxes and $600.00 in FUTA taxes. More than six months passed after the filing of that claim for refund before this suit was filed.
Plaintiff Civic Center Corporation now moves for summary judgment, asserting it is entitled to a refund of $19,015.24 plus interest on Count I because the interest portions of these awards are not "wages" for purposes of 26 U.S.C. §§ 3121(a) and 3306(b). The government concedes that the interest is not subject to employment taxes.
The Civic Center Corporation further argues that it is entitled to a refund of $85,488.28 plus interest and that St. Louis Cardinals, L.P. is entitled to a refund of $84,210.36 plus interest because the non-interest portions of these awards are also not "wages" for payroll tax purposes as there was no employer-employee relationship between the players and 25 of the 26 clubs that paid the awards. Alternatively, plaintiffs argue that even if there was such a relationship, the awards were paid not for services, but as damages for all 26 clubs' breach of the anti-collusion clause of their contract with the players' union. They further argue that even if the 1994 and 1997 awards were wages, the 1995 awards were clearly for non-salary damages, not wages.
In Count II, plaintiff alternatively asserts that if the non-interest portion of the settlement payments is "wages," it should be taxed for employment tax purposes in the years to which the settlement payments relate. The parties did not brief this issue pending the Supreme Court decision in Cleveland Indians Baseball Co. v. United States No. 96 CV-2240, 1998 WL 180623, aff'd, 215 F.3d 1325, 2000 WL 659028 (6th Cir.2000) (unpublished decision), cert. granted, 531 U.S. 943, 121 S.Ct. 338, 148 L.Ed.2d 272 (2000). The Supreme Court recently ruled in the government's favor in the Cleveland Indians case, reversing the Sixth Circuit and the district court, holding that payroll taxes imposed on back pay awards should be computed using the rate and wage base applicable in the year the back wages are actually paid, not the year they should have been paid. See United States v. Cleveland Indians Baseball Co., 532 U.S. 200, 121 S.Ct. 1433, 149 L.Ed.2d 401 (2001). In reaching its decision, the Supreme Court deferred to the IRS's longstanding interpretation of regulations under the FICA and FUTA. Id. Accordingly, the Court will rule in the government's favor on Count II.

*1049 II. DISCUSSION
Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, illustrates that no genuine issue of fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Mems. v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir.2000). The parties here agree that there are no genuine issues of material fact. Both have moved for summary judgment based on undisputed facts.

A. "Wages" for Purposes of FICA and FUTA Taxes.
The issue here is whether the distributions made to players from the settlement fund were wages for purposes of FICA and FUTA taxes. The Federal Insurance Contributions Act ("FICA"), 26 U.S.C. §§ 3101-3128, is a tax that funds Social Security and Medicare benefits. See generally, P. Allman, Withholding, Social Security and Unemployment Taxes on Compensation, 392-3d T.M. at A-1 (BNA 1996). The tax is imposed on "wages," which are broadly defined as "all remuneration for employment." 26 U.S.C. 3121(a). Employment is defined as "any service of whatever nature performed by an employee for the person employing him." § 3121(b). The term wages is defined identically for purposes of withholding under the Federal Unemployment Tax Act, ("FUTA"), 26 U.S.C. § 3301 et seq. FUTA taxes are also imposed on "wages" which are defined in 26 U.S.C. § 3306(b). The liability for payment of the FUTA tax is imposed on any "employer." § 3301. The term "employer" is defined to include any person who makes payments of at least $1,500 in covered "wages" during a calendar quarter in the current or proceeding calendar year. § 3306(a). Section 3306(b)(2) of the Internal Revenue Code defines "wages" to include all remuneration for "employment" which is defined as "any service of whatever nature, performed after 1954 by an employee for the person employing him." § 3306(c). The FICA tax is collected by the employer by deducting the tax from wages at the time of payment. See § 3102(a). Section 3111, in turn, imposes a matching FICA tax on the employer with respect to wages paid to the employee.
In Social Security Board v. Nierotko, 327 U.S. at 365-66, 66 S.Ct. 637 (1946), the Supreme Court held that back pay awarded under the National Labor Relations Act to an employee who had been wrongfully discharged constituted "wages" under the Social Security Act. In rejecting the taxpayer's argument that the back pay award did not constitute wages since it did not relate to actual services performed, the Court emphasized the broad definition of employment for FICA purposes:
The very words "any service ... performed ... for his employer," with the purpose of the Social Security Act in mind, import breadth of coverage. They admonish us against holding that "service" can be only productive activity. We think "service" as used by Congress in this definitive phrase means not only work actually done but the entire employer-employee relationship for which compensation is paid to the employee by the employer.
(emphasis added). See also Lane Processing Trust v. United States, 25 F.3d 662, 665 (8th Cir.1994) (broadly construing definitions of wages and employment to effect FICA's purposes); Gerbec v. United States, 164 F.3d 1015, 1025 (6th Cir.1999) ("phrase `remuneration for employment' as it appears in § 3121 should be interpreted broadly"); Mayberry v. United States, 151 F.3d 855, 860 (8th Cir.1998) (definition of "wages" and "employment" for purposes of FICA "are worded so as to `import *1050 breadth of coverage'") (quoting Nierotko, 327 U.S. at 365, 66 S.Ct. 637).
In this case, plaintiff argues that the awards made from the settlement fund are not wages because they were not paid by an employer to an employee. Plaintiff argues that 25/26ths of the payments at issue came from clubs that colluded to avoid employing any of these players between 1986 and 1988 and payments cannot be wages unless they flow from a pre-existing employer-employee relationship with the payor. Plaintiff also argues the awards were not wages because the origin and nature of the underlying claim was the clubs' collective breach of their contract with the players' union. Plaintiff finally argues that even if the 1994 and 1997 awards were wages, the 1995 awards were for non-salary damages and were not wages.
The Court concludes these arguments are without merit. The facts establish that the settlement payments were made to compensate players for back wages and that they were made on behalf of the clubs with whom the players had an employment relationship when the wrongful conduct leading to the back wages occurred.

B. The Settlement Payments as Payments of Lost Wages
The tax consequences of payments made pursuant to a settlement agreement are determined by the nature of the underlying claim. See Getty v. Commissioner, 913 F.2d 1486, 1490 (9th Cir.1990); San Francisco Giants v. United States, 88 F.Supp.2d 1087, 1092-93 (N.D.Ca.2000). In this case, the underlying claim was a violation of an employment agreement that resulted in lost wages. Although the Players' Association asserted contract violation claims that they contended exceeded lost wages, they did not quantify those damages and the clubs never agreed that those other claims were compensable under the Basic Agreement.
The payor's intent and the character of the settled claims constitute the relevant evidence in determining the character of these payments for tax purposes. See Knuckles v. Commissioner, 349 F.2d 610, 613 (10th Cir.1965); Agar v. Commissioner, 290 F.2d 283, 284 (2d Cir.1961). See also Getty v. Commissioner, 913 F.2d 1486, 1490 (9th Cir.1990); Robinson v. Commissioner, 102 T.C. 116, 124, 1994 WL 26303 (1994). Of the two, the payor's intent is the most important. See id. The ultimate character of the payment hinges on the clubs' "dominant reason" for making the payments. See Commissioner v. Duberstein, 363 U.S. 278, 286, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960).
Since the settlement agreement did not allocate the settlement payments among the players' monetary claims, the clubs' intent must be discerned from the process leading to the settlement. Evidence of this concentration on lost wages is found in the weight they accorded to the different classes of claims in making the decision to settle. See Threlkeld v. Commissioner, 87 T.C. 1294, 1306-1307, 1986 WL 22061 (1986), aff'd, 848 F.2d 81 (6th Cir.1988); San Francisco Giants, 88 F.Supp.2d at 1093; Robinson, 102 T.C. at 116-119; Cleveland Indians Baseball Co. v. United States, No. 96 CV-2240, 1998 WL 180623, aff'd, 215 F.3d 1325, 2000 WL 659028 (6th Cir.2000) (unpublished decision), cert. granted, 531 U.S. 943, 121 S.Ct. 338, 148 L.Ed.2d 272 (2000).
In deciding to make the payments, the attorneys for the Major League Baseball Player Relations Committee ("PRC") prepared a 52-page risk analysis which was given to each of the twenty-six clubs that detailed its analysis of the likely outcome of the grievances. The analysis started with the award for back wages already *1051 assessed by the Arbitration Panel of approximately $113,000,000 and added to that what the PRC attorneys expected would result from continuing the litigation. The focus of the risk analysis was the level of depressed "industry-wide compensation" and factored in a "very small chance of having a significant recovery" on the other claims. The risk analysis used several different methods to predict a total salary shortfall for the years 1986 through 1990 of from $267.4 million to $296.3 million. The risk analysis predicted total payments of $71.2 million for "other claims," including spillover salary effects through 1992, attorneys' fees, loss of endorsements, and loss of mobility. Averaging the four different analyses together, and adjusting for the probability of reversal on appeal with a significant reduction in damages, the lawyers predicted an overall loss on the grievance claims of $300.3 million. In summary, the attorneys for the PRC believed that the clubs would likely have to pay approximately $300 million in back wage claims without taking into account non-salary type claims such as emotional distress.
The clubs settled all the claims for $280 million, of which $243,202,104 was designated as damages, significantly less than the club's assessment of their exposure for lost wage claims alone. Accordingly, the "dominant reason" for each club making the settlement payments was to satisfy the wage claims. See Commissioner v. Duberstein, 363 U.S. 278, 296, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). Under these circumstances, it is clear that the nature of the settlement was one that brought it within the broad definition of employment related remuneration encompassed by § 3121.
The clubs argue that the payments do not qualify as wages because the players were not necessarily employees of the clubs at the times the settlement funds were distributed. It is well established that back pay awards, such as the ones at issue here, which aim to compensate employees for wages that should have been paid, constitute remuneration for employment. See San Francisco Giants, 88 F.Supp.2d at 1093-94. See also Social Security Board v. Nierotko, 327 U.S. 358, 364-65, 66 S.Ct. 637, 90 L.Ed. 718 (1946).
Plaintiff's argument that the settlement payments constitute contract damages is inconsistent with the conclusion that the payments were compensation in the nature of remuneration for employment. In Lane Processing Trust v. United States, 25 F.3d 662 (8th Cir.1994), the Eighth Circuit held that payments of sale proceeds to former employees constituted wages for purposes of § 3121. In that case, the employees had already been paid for the work they performed and the money they received from the sale proceeds was on top of those earnings. The former employees received payments because they had been employees and the payments were consequently held to be wages. Similarly, in Mayberry v. United States, 151 F.3d 855 (8th Cir. 1998), the Eighth Circuit held that a settlement award distributed to a former employee based on violations of the Employment Retirement Security Act ("ERISA"), were wages for FICA tax purposes. The Mayberry panel reasoned:
The Mayberrys argue that since class members were compensated in full for all services rendered to Continental Can, no portion of the settlement award can be treated as remuneration for "employment" under § 3121. This argument treats "service" too narrowly as referring to "only productive activity" whereas § 3121(b) means "not only work actually done but the entire employer-employee relationship for which compensation is paid to the employee by the employer." Nierotko, 327 U.S. at 365-366, 66 S.Ct. 637, 90 L.Ed. 718. In this case the class members' employment *1052 "relationship for which compensation is paid" was factored into both components of the settlement award: the calculation of the basic award and the earnings impairment additur involved the former employees' length of service with Continental Can and their expected and pre-lay-off earnings with the company.
151 F.3d at 860. The court held that under the circumstances, the award constituted wages subject to FICA tax.
Similarly, in Hemelt v. United States, 122 F.3d 204 (4th Cir.1997) another case involving the same settlement at issue in Mayberry, after noting that the language of the Internal Revenue Code and Treasury Regulations was "expansive" and that, under Nierotko, the term "any service" must be broadly construed, the Fourth Circuit held that the award was wages subject to FICA tax, observing:
The method used to calculate the awards here further supports the view that the settlement payments are properly characterized as wages. The two components of the settlement awards were based directly on taxpayers' employment relationship with Continental; key factors in determining the amounts of each award were the length of each employee's tenure with Continental and the salary he received from Continental. Thus, because the payments from Continental to taxpayers and other class members arose out of their employment relationship, they fit within the statutory and regulatory definition of wages, and FICA taxes were properly withheld from the awards.
122 F.3d at 210.
The Court agrees with the government that the settlement payments were compensation for violation of an employment agreement and as such clearly represented an outgrowth of the employment relationship. Under these circumstances, the payments fall within the broad scope of "wages" for FICA purposes.
Plaintiff's argument that this case is analogous to a personal injury settlement where an accident victim's damages are measured in terms of lost wages is not helpful. Plaintiff argues that if the use of wages as a measure of damages does not make such damages "wages" for employment tax purposes, the damages paid the players should not be construed as wages either. This argument overlooks the fact that the damages here were paid for violation of an employment contract. An employment relationship existed between the payors and the recipients at the time the wrong being remedied occurred. Thus, under these circumstances, the plaintiff's analogy to a personal injury case is inapposite.

C. Settlement Payments Made by Clubs and Employers
Plaintiff argues that it did not owe FICA taxes because the payments were not made by the person employing the players receiving payments. Plaintiff specifically contends that because each club contributed 1/26th of the overall settlement payment regardless of the damage they actually inflicted, the Court should find that 25/26ths of each payment was actually paid by teams for whom the players receiving payments were not employed.
As the court recognized in San Francisco Baseball Associates, L.P. v. United States, 88 F.Supp.2d 1087, 1091 (N.D.Cal. 2000), acceptance of this argument would result in no one paying employment taxes on the distributions from the settlement fund of what were payments made as remuneration for employment. Courts have construed employer-employee relationships broadly enough to encompass the relationship between the teams and players *1053 in this case so that it is not necessary to worry that the remedial purposes of the FICA statute will be undermined because no one paid the tax on these distributions.
Plaintiff relies on Newhouse v. McCormick Co., Inc., 157 F.3d 582 (8th Cir.1998) for the proposition that no FICA liability exists because 25 of the 26 clubs contributing to the settlement fund, and by extension to each settlement payment, did not have an employment relationship with any particular player receiving a payment. In McCormick, a judgment creditor objected to the withholding of employment taxes from his award of damages for age discrimination when McCormick refused to hire him. The Eighth Circuit held that because there was no employment relationship between McCormick and the job applicant at the time of the discrimination resulting in the judgment, he was not an employee for withholding tax purposes. See 157 F.3d at 586.
In this case an employment relationship existed between each compensated player and one of the clubs at the time the wrongful collusion occurred. The settlement payments were paid by the employing teams to remedy the determent that the players suffered as a result of that wrongful conduct. The fact that some of the money used to pay the players may have come from other clubs is not determinative. In Lane Processing Trust, the Eighth Circuit rejected a similar argument:
The Trust also argues that FICA and FUTA are inapplicable here because the Lane Companies employees did not work for the Trust, and thus the Trust was not an "employer." This argument also is without merit. The Trust need not have employed the Lane Companies employees in a legalistic sense to be treated as their employer for FICA and FUTA purposes. See Otte v. United States 419 U.S. 43, 50-51, 95 S.Ct. 247, 252-53, 42 L.Ed.2d 212 (1974).
25 F.3d at 666. In McCormick, the wrongful conduct being remedied by the judgment was the failure to hire someone. In this case, the wrong being remedied by the settlement is the violation of an employment agreement. The effect of this violation was to make it less expensive for each team to employ its employees by depressing their wages. While it took all the teams acting together to make the violation of the Basic Agreement effective, the harm incurred by each player was directly related to the team that employed him, who was able to get his services at a lower price or to not increase his salary because of the depression of salaries overall. Under these circumstances, the nexus between the payment and the employment relationship is sufficient for the clubs to qualify as employers of the persons receiving the settlement payments.

III. CONCLUSION
The Court concludes that plaintiff Civic Center Corporation will be granted summary judgment in part on Count I because, as the government concedes, the interest portions of these awards are not "wages" for purposes of 26 U.S.C. §§ 3121(a) and 3306(b). Accordingly, the government shall refund $19,015.24 plus interest to the Civic Center Corporation.
The government's motion for partial summary judgment will be granted. The Court concludes the settlement distributions were remuneration for employment and that the remuneration was paid by a party having an employment relationship with the recipient of the funds. Therefore, plaintiff is not entitled to refunds of the FICA and FUTA payments made as a consequence of the settlement payments.
Finally, the Court finds in favor of the government on Count II pursuant to the *1054-1068 recent Supreme Court decision in United States v. Cleveland Indians Baseball Co., 532 U.S. 200, 121 S.Ct. 1433, 149 L.Ed.2d 401 (2001).
Accordingly,
IT IS HEREBY ORDERED that plaintiff St. Louis Cardinals' motion for summary judgment is GRANTED in part and DENIED in part. (Doc. 20)
IT IS FURTHER ORDERED that defendant United States shall refund $19,015.24 plus interest to the Civic Center Corporation.
IT IS FURTHER ORDERED that defendant United States' motion for partial summary judgment is GRANTED. (Doc. 20)
EDITOR'S NOTE:
NOTES
[1] The Cardinals baseball team was owned by plaintiff Civic Center Corporation during a portion of the relevant time period, and by plaintiff St. Louis Cardinals, L.P., during the remaining time period. Whenever it is not confusing to do so, the Court will refer to both plaintiffs collectively as the plaintiffs.
[2] The full name of the Basic Agreement is "Basic Agreement between The American League of Professional Baseball Clubs and the National League of Professional Baseball Clubs and Major League Player's Association."
[3] For purposes of this motion, the Court refers to both ownership entities as the Cardinals except where it is necessary to distinguish between the two ownership entities. The St. Louis Cardinals, L.P. shall be referred to as "SLLP" and the St. Louis National Baseball Club, Inc. shall be referred to as "SLNBC."